```
 1                    UNITED STATES DISTRICT COURT

 2                    MIDDLE DISTRICT OF FLORIDA

 3                        ORLANDO DIVISION

 4

 5   UNITED STATES OF AMERICA,       )
                                     )
 6                  Plaintiff,       )
                                     )
 7   vs.                             )   Case No. 6:13-CR-304
                                     )
 8   WILLIAM A. WHITE,               )
                                     )
 9                  Defendant.       )
                                     )
10   _____)

11

12            WEDNESDAY, SEPTEMBER 3, 2014; 2:00 P.M.
                PRE-TRIAL ISSUES AND MOTION HEARING
13            BEFORE THE HONORABLE JOHN ANTOON II
                   UNITED STATES DISTRICT JUDGE
14

15

16   COUNSEL FOR PLAINTIFF:
       Vincent Chiu, AUSA
17     James Mandolfo, AUSA

18   COUNSEL FOR DEFENDANT:
       Larry B. Henderson, AFPD
19

20

21

22

23
     _____
24
     *Proceedings recorded by mechanical stenography
25    Transcript produced by computer-aided transcription*
```

```
 1                    P R O C E E D I N G S
 2              DEPUTY CLERK:  This is the case of United States of
 3  America versus William A. White, case number 6:13-CR-304.
 4              Will counsel please state their appearances for the
 5  record?
 6              MR. CHIU:  Good afternoon, Your Honor.
 7              Vincent Chiu on behalf of the United States.
 8              I'm joined at counsel table by AUSA James Mandolfo.
 9              MR. MANDOLFO:  Good afternoon.
10              MR. HENDERSON:  Good afternoon, Your Honor.
11              Larry Henderson with the Federal Defender's Office.
12              Seated to my left is Mr. William White.
13              THE COURT:  Okay.
14              Well, this is a pre-trial conference.  And I thought
15  we would take up some of the evidentiary issues that have been
16  framed by the government's motion and the defendant's response
17  to that motion and any other things that you wish to take up.
18  Is there anything else that we need to address besides those
19  issues that are framed in the papers?
20              MR. HENDERSON:  Your Honor, we have actually entered
21  into some stipulations, so they could be filed.
22              THE COURT:  Okay.
23              MR. HENDERSON:  One dealing with the anonymous jury.
24  I've submitted a proposed instruction for that.  And other than
25  that, I'm in the process of supplementing the voir dire that --
```

1    as to the venire.  It's kind of a work in progress.

2    I understand the Court needs that as soon as possible, so I'm

3    try to get it filed either later this afternoon or early in the

4    morning.

5              THE COURT:  You say you filed an instruction

6    regarding an anonymous jury?

7              MR. HENDERSON:  I did, Your Honor.  I have a copy.

8              THE COURT:  May I see it?  I haven't seen it yet.

9              MR. HENDERSON:  May I approach?

10         (Pause in proceedings.)

11             THE COURT:  Okay.  That's fine.

12             This is your stipulation?

13             MR. HENDERSON:  I don't know if the government would

14   agree with that that was filed, but --

15             I don't know if you have any objection to it.

16             MR. CHIU:  I haven't had a chance to really review

17   it extensively, but I don't anticipate there will be an issue

18   with it.  I just got to look at it.  From first glance, I don't

19   believe there is going to be an objection to that instruction,

20   though.

21             THE COURT:  Okay.  Well, let me know in the next 24

22   hours if you have an objection.

23             MR. CHIU:  If there is an objection, I'll file

24   something.  Otherwise -- but I don't anticipate there being

25   one.  Like I said, I haven't really had a chance to look at it

1    closely.

2              THE COURT:  Anything else?

3              MR. CHIU:   I believe there are some contested jury

4    instructions.   The defense filed some objections to a couple of

5    the jury instructions.   I don't know if the Court wants to take

6    that up now.

7              MR. HENDERSON:  I did file objections.   Some are to

8    the standard jury instructions.   It's my pet peeve, as far as

9    the reasonable doubt instructions that are the pattern

10   instructions with the 11th Circuit.   Some of those have been

11   presented before and rejected by the 11th Circuit.   I tried to

12   note that in the objections.

13              As to the reasonable doubt definition, I do not

14   believe that fairly and accurately defines what reasonable

15   doubt is.   I think it diminishes the burden of proof by the

16   government.   I tried to articulate those grounds.   I think the

17   two main objections that would deal with the issues in this

18   case, one deals with 875(b) and (c) and whether it's a

19   reasonable person standard as to whether a true threat was made

20   or whether that's a subjective standard.

21              I point out that that issue is now pending before

22   the Supreme Court of Florida -- excuse me -- the United States

23   Supreme Court.   And in order to present that issue fairly to

24   the Court, I have pointed that out and objected to the

25   instruction, that is, essentially, the pattern instruction from

1    the 11th Circuit.  It defines true threat as essentially that

2    that would be perceived by a reasonable person or by an

3    objective standard as opposed to being subjectively required by

4    the defendant --

5            THE COURT:  Where did the case originate that is now

6    before the Supreme Court?

7            MR. HENDERSON:  The Ninth Circuit has held that it

8    should be a subjective intent, pursuant to Virginia v. Black

9    about the rights under the First Amendment to speech.  And I

10   believe it was the Third Circuit that disagreed so it would be

11   the United States Supreme Court has recently granted certiorari

12   and that is pending on that question.  In fact, the parties

13   were directed to brief that specific issue, so that is pending.

14           THE COURT:  Are those the only two circuits who have

15   -- which have issued opinions on this?

16           MR. CHIU:  No, Your Honor.

17           I don't know if you want me to address that or --

18           MR. HENDERSON:  Go.

19           MR. CHIU:  The current 11th Circuit law, which the

20   jury instructions are essentially patterned after, it's United

21   States v. Alaboud, A-l-a-b-o-u-d, 347 F.3d 1293.  That's a 2003

22   case.  Basically saying that, "A communication is a threat

23   when, in its context, it would have a reasonable tendency to

24   create apprehension that its originator will act according to

25   its tenor," which is the reasonable person standard or close to

1    it that the Third Circuit has adopted as opposed to the Ninth

2    Circuit's objective or -- I'm sorry -- subjective intent

3    standard.

4              THE COURT:  What would the government say about a

5    special verdict form, including a finding, a separate finding,

6    regarding the subjective intent?  Do you find number one or do

7    you find number two?

8              MR. CHIU:  We wouldn't necessarily have an objection

9    to that.  I guess the purpose of that being if the Supreme

10   Court does find one way, then we have basically both standards

11   addressed.  We would not have an objection to that.

12             THE COURT:  Mr. Henderson.

13             MR. HENDERSON:  I apologize.  I'm at a loss for the

14   other substantive objection that I made.  I made two.  That was

15   the first, and I did not bring a copy of my objections with me

16   to this.

17             THE COURT:  Oh, I have them.

18             Oh, the objections to the jury instructions?

19             MR. HENDERSON:  Yes.  I believe it's document --

20             THE COURT:  I do not have that, but Darlene can get

21   it.

22             MR. HENDERSON:  It is sitting in my printer right

23   now as we speak.

24        (Pause in proceedings.)

25             MR. CHIU:  Your Honor, if I may just have a -- if I

1    may have the evening to ponder this additional question of a

2    special verdict.  It's sort of -- it's sort of a new issue that

3    has just come up and I would like to do a little bit of

4    research on that, if that's all right.

5          MR. HENDERSON:  The other objection deals with the

6    use of 404(b) evidence and as to identity and the need for an

7    accurate curative instruction.  We do not believe the

8    instruction in the proposed packet adequately states the law in

9    using similar fact evidence to prove identity.  And frankly, I

10   can't imagine how to formulate an instruction that would

11   correctly state the law to the jury on how that is to be used,

12   so we object to the one that's proposed at this time.

13          It's more or less the standard instruction out of

14   the 11th Circuit pattern instructions, but it does not deal

15   with identity.  It deals with issues such as motive, absence of

16   mistake, and those sorts of things.  But as to use of similar

17   fact evidence to show identity, there's a special standard that

18   applies.  And the proposed instruction does not adequately

19   convey that to the jury.

20          It's compounded by the fact that I honestly believe

21   that some of the evidence that is going to come in as

22   inextricably linked to the offense.  That said, it's still bad

23   act evidence, if you will, or similar bad act evidence.  So

24   unless the jury gets a clear and concise instruction on how

25   such evidence could be used to prove identity, then I think

1    that there is a great danger of unfair prejudice to Mr. White.

2              THE COURT:  Well, is what you're telling me is that

3    you want an instruction from the Court as to how the government

4    is using this evidence to establish identity?

5              MR. HENDERSON:  I think that the -- if the evidence

6    gets presented --

7              THE COURT:  Because the government probably doesn't

8    have any objection to that.

9              MR. HENDERSON:  If there is evidence presented that

10   would qualify, I think first the Court needs to determine, as a

11   matter of law, whether it can be used at all to prove identity

12   or if it shows modus operandi sufficiently similar to establish

13   that.  And that would be the test for -- to prove identity.

14             So if the evidence is coming in to show absence of

15   mistake or motive or whatever the government is planning on

16   using that for with the instruction that they give, before that

17   type of evidence could be used to prove identity, first there

18   must be a finding from the Court that it's legal and sufficient

19   to do so.  Otherwise, I think the Court would be required to

20   instruct the jury that it could not be used to establish

21   identity.

22             If the Court finds that the previous conduct is

23   sufficiently similar so as to establish a modus operandi, then

24   I think that in order to show identity, I think that then the

25   Court would then need to instruct the jury on the law as to

1    that standard so that the jury would also pass on whether that

2    conduct was so similar that it logically tends to prove

3    identity.

4         Part of the problem I have with that, Your Honor,

5    is the standard as far as the similarity of the evidence and

6    the acts of what I'll call the perpetrator.  Some of the

7    circuits have two different standards where at first there's a

8    preponderance of the evidence standard used to show that the

9    defendant committed those acts and then that is used to

10   bootstrap up to proof beyond a reasonable doubt to show that

11   the identity of this particular charged offense is the same as

12   that person when the first instance, if you will, was proved by

13   a preponderance of the evidence standard.  So -- and I note I

14   tried to articulate that in my objections, and that's our basic

15   ones.

16        THE COURT:  Have you seen this document, the

17   defendant's objections to the proposed jury instructions?

18        MR. CHIU:  Yes, Your Honor.

19        THE COURT:  Well, I think we should use this time

20   to get a handle on all these issues and resolve what we can.

21   I can tell you I'm going to give the standard instruction on

22   reasonable doubt, the 11th Circuit instruction on reasonable

23   doubt, so that's one issue out of the way.

24        I suggest that what we do is start with the

25   defendant's objection to the government's trial brief, which

1    includes a motion in limine -- it's document number 43 -- and

2    address those issues as they're raised by -- in the order

3    raised by the defendant and see if we can sort out some of the

4    problems.

5             The defendant is arguing that the government must

6    establish the facts that it intends to use under 404.  And I

7    guess there's some -- he's also suggesting that there be a

8    proffer.  I don't know about the formality of the proffer.

9    Maybe we can take care of that here, but perhaps not.  The

10   first area is -- the first objection comes on page 2 and the

11   objection that -- the government's evidence that Mr. White was

12   on supervised release in West Virginia.

13            Do you want to respond to that, Mr. Chiu?

14            MR. CHIU:  Thank you, Your Honor.

15            The whole premise of this case involves the

16   defendant, you know, initially fleeing the jurisdiction of

17   Roanoke, and while leaving for Mexico or after leaving for

18   Mexico that he's alleged to have made these threats.  This sort

19   of -- the whole action and adventure of leaving for Mexico is

20   documented in the Facebook records that the government intends

21   to introduce, which are sort of the bulk of the government's

22   evidence in this case.

23            So frankly, those records and Mr. White's comments

24   about leaving the country, Mr. White's comments or at least the

25   comments on Facebook about Mr. White leaving the country, the

1   comments on Facebook about Judge Turk and Mr. White's case in

2   Roanoke frankly just wouldn't make any sense.  And they are --

3   I mean, they are an integral part of this story.

4              THE COURT:  Well, let's be clear for the record.

5              This reference to Judge Turk is included in the

6   communication upon which, at least in part, the indictment in

7   this case is based, right?

8              MR. CHIU:  Part of the reference is to Judge Turk,

9   but there's other references to Judge Turk and the defendant's

10  case in Roanoke sprinkled throughout the Facebook evidence that

11  the United States intends to introduce.  And, frankly, it's a

12  lot of the catalyst for the defendant leaving the country sort

13  of by his own admission or at least by the admission from

14  Facebook posts, as well as his own pleadings.  So it's one of

15  those things that if we try to untangle from the facts of the

16  case, it would be -- it would leave sort of this massive gaping

17  hole in the story.  I forgot to mention, it also explains his

18  ultimate arrest and return to the United States when he was in

19  Mexico.

20             THE COURT:  Tell me the sequence of events again to

21  probably save time regarding the events in West Virginia and

22  the defendant's leaving West Virginia and going to Mexico and

23  the case here, the facts giving rise to the case against local

24  officials.

25             MR. CHIU:  As far as the time line goes, I'm going

1    to try and think of the most concise way to explain this.  The

2    defendant was on supervised release in Roanoke with Judge Turk

3    as the supervising judge.  Sometime in early May, about the

4    first week of May, we're going to present evidence that the

5    defendant left his home and headed for Mexico, you know, in

6    violation of his terms of supervised release, probably about

7    May 6th or May 7th or so, thereabouts, and I don't know that

8    I have the exact dates in front of me.  The first threat from

9    the e-mail account that's most at issue in this case went to

10   Judge Turk.  That was on -- I believe it was May -- let's see,

11   the first threat to Judge Turk -- well, actually strike that.

12            On May 10th, Judge Turk, Tim Heaphy, who is the

13   U.S. Attorney in the Western District of Virginia, Tom

14   Bondurant, who was an Assistant U.S. Attorney that used to be

15   -- used to work on Mr. White's case all received books in the

16   mail, a book authored by the defendant with some writing in it

17   that we would submit is similar to the writing and the threats

18   that are at issue.

19            And then, on May 18th there was an e-mail sent from

20   the e-mail address that's at issue in this case, sent to Judge

21   Turk.  And then, the e-mails that are charged in the indictment

22   were sent from that same e-mail address on May 19th.

23   Basically, May 19th through May 21st.  And ultimately,

24   defendant was arrested in Mexico on June 8th, and there's --

25            The evidence that we're going to present is going to

1    be a lot of Facebook correspondence and records occurring on

2    the Bill White account on Facebook spanning from about February

3    or March of -- I'm sorry -- March or April of 2012 through the

4    time of his arrest.  I don't know if you want more specificity

5    as far as --

6              THE COURT:  The events of this case --

7              MR. CHIU:  -- would have been May 19th, 20th --

8    May 19th and 20th.

9              THE COURT:  So they're contemporaneous with the --

10             MR. CHIU:  Yes.

11             THE COURT:  -- communications in West Virginia?

12             MR. CHIU:  Yes.

13             The communication that went to Judge Turk happened

14   on May 18th, which was the day before.  And the mailed

15   correspondence was about a week prior.

16             THE COURT:  So one of the similar facts that you

17   would want to show is that the defendant was prosecuted by

18   officials in the West Virginia case that are named, as well as

19   Mr. Lamar here.

20             MR. CHIU:  Yes, Your Honor.

21             THE COURT:  And the judge is involved in those two

22   cases?

23             MR. CHIU:  Yes, Your Honor.

24             Yes.  That's the connection or one of the

25   connections between this e-mail account and the defendant that

1    the government would draw.

2            THE COURT:  So how similar are the comments besides

3    the use of the word pigs?

4            MR. CHIU:  Well, the comments in the books are quite

5    short.  Give me a second and let's see -- one of the books

6    said, "Be glad it's just a book, pig."  One of the books said

7    -- was written -- if I may have a moment.

8            (Pause in proceedings.)

9            THE COURT:  Are the communications, the texts of the

10   communications, replicated in your papers to the extent that

11   you intend on using that kind of evidence?

12           MR. CHIU:  Yes, Your Honor.

13           THE COURT:  So, I have everything in the papers that

14   you are going to use and want to use?

15           MR. CHIU:  Yes, I have it here.

16           The book to Tom Bondurant, on it was written,

17   "Everything about you is known, pig.  Your queer daughter, the

18   affair with your neighbor --" and this is the important part,

19   underlined, it says, "It's coming down fast," which is a phrase

20   from the song Helter Skelter, and it's a phrase that was used

21   throughout the case here and, I believe, including one of the

22   threats.  So, we would submit that that's also part of it.

23           And the testimony is going to be -- there's going to

24   be testimony that the defendant asked somebody -- she's going

25   to testify -- to actually send these packages after dropping

1   him off across the Mexican border and coming back.  So it's one

2   of those -- again, one of those -- if we told the whole story

3   of the defendant going to Mexico, you know, in the context of

4   these threats, it's very difficult to leave out sort of these

5   large parts of it.  And there's references to these books on

6   the defendant's Facebook page or at least references to these

7   events occurring on the defendant's Facebook page that we

8   intend to present evidence of as well.

9           THE COURT:  Okay.

10          MR. HENDERSON:  Your Honor, first, the

11  communications that went to the officials in Virginia, that was

12  in reference to a prior case that Mr. White had.  So he was on

13  supervised release for a case that they tried.  Since then,

14  there has been another trial involving threats to Mr. White's

15  wife while he was in Mexico, so there are actually two cases

16  out of Virginia.  The fact that he is on -- or was on

17  supervised release at the time, to the extent that's relevant

18  and inextricably linked, I do not think the underlying basis of

19  the charges is relevant.

20          The whole summary was given to the Court now without

21  mentioning what the charges were, simply the fact that those

22  officials presided over Mr. White's trial in Virginia and

23  placed him on supervised release at the time, and he left there

24  and went to Mexico.  So to the extent that's relevant, I think

25  that's all that needs to be said.  Anything more would be

1    unfairly prejudicial.  Mr. White was never charged with

2    anything in Florida.  The officials here are officials --

3                THE COURT:  You're saying -- let me get this clear,

4    Mr. Henderson.  You're saying that you specifically object to

5    the facts of the underlying case in -- or cases in West

6    Virginia?

7                MR. HENDERSON:  Yes, Your Honor.

8                The charges, any evidence that went there that would

9    show that Mr. White committed those offenses.  He was tried --

10               THE COURT:  What do you say about that, Mr. Chiu?

11               MR. CHIU:  We're not seeking to introduce any of

12   that evidence, Your Honor.

13               THE COURT:  Okay.

14               Your motion is granted to that extent.

15               MR. HENDERSON:  I would ask the Court to make a

16   determination as to whether that evidence dealing with the

17   conduct that occurred in Virginia, assuming for the sake of

18   argument that these packages were delivered to those officials

19   with handwritten notations in those books that said whatever it

20   said, whether that alone is sufficiently similar to establish

21   modus operandi to show identity to the extent that evidence

22   comes in, then I think the jury needs to know that that, in and

23   of itself, is not sufficient proof to establish Mr. White's

24   identity for doing something this similar.  Whoever was on that

25   Helter Skelter account was sending anonymous e-mails to judges

```
 1   and officials here in the Orlando area, so that is not
 2   consistent at all.
 3         THE COURT:  What evidence does the government intend
 4   to offer to show that this defendant wrote the communications
 5   that are involving the officials in West Virginia?
 6         MR. CHIU:  We're going to have a witness testify
 7   that she delivered the packages at the request of the defendant
 8   and that she recognizes the handwriting, at least on the
 9   outside of the packages, as the defendant's handwriting.  And
10   just to clarify, though --
11         THE COURT:  And then out of -- you know, this is
12   something that you don't want before the jury, but I think it's
13   also relevant that these are for purposes of establishing
14   identity via modus operandi evidence would be that the
15   defendant was, indeed, charged in both venues and that these
16   were the officials involved in those prosecutions, the judge
17   and the prosecutors.
18         MR. CHIU:  And, Your Honor, the United States'
19   primary theory as to the admissibility of that doesn't even get
20   to 404(b).  We would argue that that specific evidence, not the
21   underlying evidence of why he was on supervised release or
22   anything like that, that specific evidence regarding the
23   mailings is inextricably intertwined with the evidence in which
24   my understanding of the case law is that that's actually a
25   separate issue other than 404(b).  404(b) actually takes it out
```

1    of the realm of other acts.

2              THE COURT:  But you're offering it to show that he's

3    the person who made the communications in this case.  That's

4    why you're offering it, right?

5              MR. CHIU:  Yes.

6              THE COURT:  Well, how is it inextricably

7    intertwined, just because she could say she gave him two

8    packages and one was coming to Florida and I recognize his

9    handwriting?  You're offering it to show that he's the person,

10   right?  I mean, I don't understand how it's inextricably

11   intertwined.

12             MR. CHIU:  Well, I guess what it is, is that the

13   evidence that --

14             THE COURT:  It might be intertwined, but it can be

15   extricated, it seems.

16             MR. CHIU:  Well, I mean, even under a 404(b)

17   inquiry, though, we would submit that the -- I mean just,

18   frankly, the fact of the people who are involved, the

19   similarity between that and the time frame, as well as the --

20   you know, as well as the writings in those books and the very

21   -- I mean, the modus operandi of showing the person -- showing

22   the victim that one knows where they live is -- you know, is

23   similar to the threats that are at issue here.  Because the

24   whole point -- the whole crux of these threats is to send the

25   message that, you know, that -- you know, basically the

defendant or whoever -- you know, our theory is that the

defendant can reach them, and they know where they live.

And if I may, Your Honor, also the e-mail itself,

in Count 1 and 2 and 4 and 5, one of the specifics in that

e-mail says, don't believe us.  We just creepy-crawled the home

of James C. Turk for righteous brother William A. White and we

will creepy-call, you know, over you, essentially.  We would --

our argument is going to be that that book that Judge Turk

received is the reference that is being made in that specific

e-mail.

THE COURT:  Well, your motion, document 43,

Mr. Henderson, says, "The first area of evidence sought to be

used by the government is evidence that Mr. White was on

supervised release in the Western District of Virginia...," so

it's Virginia, not West Virginia.  I've been saying West

Virginia.  It's the Western District of Virginia.  "...at the

time of the offense and threats to Judge Turk and others

involved in the defendant's case..."  Well, the motion --

there's no objection to that, and that motion is granted.

The next issue raised by the defendant is in

paragraph 4 on page 3 of document 43, having to do with

Facebook posts regarding the George Zimmerman case and a threat

to Judge Lester.  Why is that relevant to this case?

MR. CHIU:  The relevance to the case is, even though

it's a different e-mail address, that the language in that

1    particular threat is actually very, very similar to the

2    language that was in the threats in the indictment.  The main

3    difference being that it was sent from a different -- just sent

4    from a different e-mail account.  And that would be connected

5    to the defendant through the timing of posts regarding that

6    case in relation to -- or I'm sorry -- the timing of posts on

7    the defendant's Facebook page regarding the Zimmerman case and

8    regarding Judge Lester in relation to the timing of that e-mail

9    threat being sent out.  So, I mean, I guess it would be under,

10   you know, the same inquiry of 404(b), as well as being

11   inextricably intertwined.

12            THE COURT:  Well, tell me how that's intertwined

13   with the facts of this case.

14            MR. CHIU:  Well, that happens about a week after.

15   And in the evidence -- in the Facebook evidence that we're

16   going to present -- and I don't want to misrepresent here.

17   In the Facebook evidence that we're going to present, the

18   defendant actually, you know, begins to post on his Facebook

19   page and he starts a Facebook group called Protests -- or the

20   defendant's user account at the very least on Facebook starts a

21   group called Protest Judge Kenneth Lester.  And on that group,

22   the defendant's account posted Judge Lester's telephone number,

23   home address, and the names of his family members.

24            So that, plus the fact that the language in the

25   threat to Judge Lester is very similar and not just in the use

1   of the term pigs, but also in terms of the types of violence

2   being threatened, as well as the terminology from the Charles

3   Manson events is strikingly similar.  So, I mean, if there's --

4   our argument is going to be that's the same -- the e-mail is

5   clearly coming from the same person and that that e-mail is

6   linked to the defendant's Facebook account.  And the full text

7   of the e-mail is in the United States' pleadings.

8               THE COURT:  So you think identity is going to be a

9   big issue in this case?

10              MR. CHIU:  We believe identity will be the primary

11  issue.

12              THE COURT:  Okay.

13              Mr. Henderson, do you want to comment on that one?

14              MR. HENDERSON:  I believe that identity is the key

15  issue here.  And we have a number of different accounts that

16  are out there.  We have accounts that are attributed to

17  Mr. White under his own name that he or people at his direction

18  have used at some period of time, but there are other accounts

19  that have been created.  One is this Helter Skelter account

20  that involves the threats that form the basis of the charges.

21  Another one is this Red Pawn account that sent communications

22  to Judge Lester, posted something on there to Judge Lester.

23              So there are different accounts that are there.

24  And I believe it's the government's theory that Mr. White is

25  setting them all up and sending them all out at the same time.

1    I think somebody is or somebody could be.  But I do not believe

2    that they are sufficiently similar and that they point to

3    Mr. White with Mr. White's known conduct.  It can be said that

4    they are modus operandi.

5            Again, he sent -- according to the government's

6    case, Mr. White sent packages to his own judge, to his own

7    officials in his own case in Virginia after he was prosecuted,

8    and they had messages on them.  That was sent through the

9    United States mail, and that was to that.  We're dealing here

10   in Florida with communications to judges in other cases in

11   other matters.  And the issue is, is who created those

12   accounts?  Who mailed those messages?  And although those are

13   perhaps similar, there's no tie to Mr. White as far as those

14   accounts, other than what the government is representing.

15           THE COURT:  How are you going to show that he sent

16   the message, any of the messages?

17           MR. CHIU:  Well, that's going to be through the

18   circumstantial evidence from his Facebook account, as well as

19   evidence that was seized off his MP3 player at the time of

20   arrest, as well as the testimony of --

21           THE COURT:  What did he have with the recording

22   device?

23           MR. CHIU:  There were songs.  The songs that are

24   referenced on the defendant's Facebook page that are posted

25   simultaneously or, you know, contemporaneously with the threats

1    -- are with threats, and the lyrics are contained inside a lot

2    of the threats.  Also, one of the things that --

3              THE COURT:  You see, one of the things that's

4    troubling here is I think sometimes, at least, when you have

5    similar fact evidence to show identity, you establish the

6    identity of known events where there's no question as to the

7    identity.  There's an eyewitness identification or some other

8    clear identification.  And you say because the event was

9    similar there, he must have committed the event that's charged

10   here.  And what I'm hearing you say is that you don't really

11   have anything showing that he sent any of these communications

12   to anybody.  But because they were all similar, and two of them

13   included people who were prosecuting him, he must have done the

14   others.  It's sort of backwards.

15             MR. CHIU:  Well, there's other evidence.

16             For example, the defendant's Facebook account.

17   The threats that are at issue in the indictment were actually

18   posted as well on the defendant's Facebook account.  But that's

19   why our argument is that a lot of these other e-mails are

20   inextricably intertwined to show that the same person has sent

21   these e-mails, and all of these e-mails link back to the

22   defendant's Facebook account.  So that's why it's -- we would

23   argue it's not really other acts evidence of things done prior.

24   It's really just evidence that -- circumstantial evidence that

25   the defendant is the person that is sending the e-mails.

1          MR. HENDERSON:  Your Honor, may I clarify one point?

2          I believe, forensically, it can be shown that

3  Mr. White received copies of those threats that were e-mailed,

4  and he received a copy as they were e-mailed.  So he received

5  on his Facebook account those -- some of those threats.  Not

6  all of them, but some of them.  And he at that time or someone

7  using his account at that time re-posted those on his account

8  saying I just received this, essentially.

9          So it's not -- I mean, I don't want to get the cart

10  before the horse here.  He received those posts on his account,

11  and then they were posted on that account.  So when I say he,

12  I mean, that account received the threatening posts and they

13  were at that time posted.  So they emanated from this Helter

14  Skelter account to his account.  And it was after that that

15  they were posted on his account.  And I believe that's what the

16  forensics show.  And again, Mr. White's name was mentioned in

17  those as well, so he's brought into this somehow.

18          THE COURT:  I have to confess, I'm getting more

19  confused than I was in the beginning.  I'm not getting --

20  things aren't getting clearer.  They're getting cloudier.

21  Do you have evidence that these accounts were registered in his

22  name?

23          MR. CHIU:  Your Honor, the accounts themselves that

24  sent the e-mails out, and particularly the account that sent

25  the e-mails out in the indictment, basically it comes back to

```
 1   an anonymized proxy, and it was actually created just prior to
 2   the e-mails going out.  Also, part of the evidence that's going
 3   to be presented is going to be posts on the defendant's page
 4   advocating the use of anonymized proxies so that your IP
 5   address can't be introduced.  I mean, there is no -- what this
 6   is, is this is a circumstantial case.  So there's not going to
 7   be a witness who comes in and testifies that the defendant is
 8   the person that sent the e-mails out.  The evidence that the
 9   United States is going to present --
10              THE COURT:  Well, you do have evidence, you say,
11   that the books were sent out.
12              MR. CHIU:  Yes.
13              THE COURT:  You have an eyewitness on that.
14              MR. CHIU:  Right.
15              The evidence that the United States is going to
16   present is evidence of the defendant's Facebook account usage,
17   and there's linkage with that and the e-mails.  For example,
18   in the hours prior to the e-mail being sent out in Count 1 to
19   Lawson Lamar and Judge Komanski and Kelly Boaz, the defendant's
20   Facebook account -- on the defendant's Facebook account the
21   defendant's user account was posting solicitation for the names
22   and addresses and information of the people involved in that
23   prosecution.  Then, it was posting the addresses and names of
24   those people, like Lawson Lamar and Judge Komanski, and then
25   this e-mail goes out shortly thereafter.  So that's the
```

1 connection with the defendant.

2    THE COURT:  What can you show he did?  He.

3    MR. CHIU:  That's the connection with it.  It's on

4 the defendant's Facebook account, all that is happening, and

5 then shortly thereafter the e-mails go out.  That's how this --

6    THE COURT:  When you say his Facebook account,

7 that's his?

8    MR. CHIU:  Yes, the defendant's Facebook account.

9    THE COURT:  It's registered to him?

10    MR. CHIU:  Yes.  And that's how the case begins.

11    Now, there's -- you know, there's a lot of other

12 evidence, hence, the long trial brief, but that's sort of the

13 catalyst for it.

14    THE COURT:  The defendant says he has not received

15 any discovery or information regarding the government's

16 investigation into red pawn 1111 account.  Is there any

17 discovery to be delivered?

18    MR. CHIU:  No, Your Honor.

19    The only information we have on that account is that

20 we don't know where it began.  You know, we don't know where it

21 -- we don't have -- is that it comes back to some sort of

22 anonymous person, which I believe those records were turned

23 over, but there's really very little records from them.

24    THE COURT:  How about the next area identified by

25 Mr. Henderson, which is involving the reporter for the Roanoke

1   Times?

2          MR. CHIU:  Again, the posts that we're looking to

3   introduce evidence of occurred on -- between, like, May 28th

4   and June -- basically, May 28th and May 29th.  They were posted

5   in -- they were posted on the tail end of articles about the

6   defendant by a reporter named Dan Casey who has sort of written

7   a number of articles disparaging the defendant and his views.

8   And the user name that posted these comments are, "Charlie

9   f'ing Manson," and that's quoted, registered to the e-mail

10  address, the helter-skelter@hotmail.com e-mail address that is

11  -- that sent out the e-mails in the indictment and uses the

12  same language or similar language as the e-mails in the

13  indictment.

14          Again, we're not introducing this necessarily as

15  modus operandi, 404(b) other acts evidence.  We are introducing

16  this as circumstantial evidence that, first of all, there is

17  one person that is sending out all of these e-mail addresses

18  and that one person -- and all of those connect back to the

19  defendant.  So that's why it's not sort of a textbook for

20  404(b) evidence.  It's really simply just circumstantial

21  evidence of identity of the defendant.  But again, the comments

22  on the Roanoke Times page involve, you know, sodomy with knives

23  and writing the word pig in blood on, you know, on the victim's

24  walls and going after the victim's children.

25          THE COURT:  So you would want to establish -- I

1   guess in doing this is you would -- with all these cases -- all

2   these categories of evidence, you would have to establish the

3   defendant's relationship with the recipient.

4           MR. CHIU:  Yes.

5           THE COURT:  Mr. Henderson identifies as a separate

6   area of evidence or specific category of evidence the reference

7   to the Manson murders, the use of pig and Helter Skelter and

8   all that.  Is that a separate issue or is that just part of

9   these other issues we've been discussing, Mr. Henderson?

10          MR. HENDERSON:  I believe that that's throughout the

11  communications.  That's language from Helter Skelter.  It's

12  attributed to --

13          THE COURT:  Well, it's not really a separate area of

14  evidence.  It's just that that's what the government says

15  connects this defendant with those other communications.

16          MR. HENDERSON:  They say in the trial brief that

17  Mr. White is obsessed with Charles Manson and that that was, I

18  guess, in part why these communications were in there.  I

19  suspect they are going to maybe try and prove that.  I don't

20  know.  But to the extent that that reference is attributable to

21  Mr. Manson, Helter Skelter, and that they're in the

22  communications, they're there, and we're not asking that they

23  be excised.

24          THE COURT:  Okay.  The fifth area is evidence that

25  he espouses white supremacist views.  What is that?

 1           MR. CHIU:  Well -- and, Your Honor, it's one of
 2   those things where how much we present of that depends really
 3   on sort of how much the defense is going to contest the issue.
 4   Basically, the reason we're going to present evidence of that
 5   is that in the American front, the people that are sort of at
 6   issue in the threats in Counts 1 -- well, in all of the counts
 7   in the indictment is a neo-Nazi white supremacist group.  So,
 8   evidence that the defendant sympathizes and espouses those
 9   views is strong evidence of the defendant's motive to make
10   these threats on their behalf.  Now, you know, sort of the
11   extent to which we'd go into that, again, just depends on how
12   heavily it's contested.
13           THE COURT:  When you say how heavily he contests it,
14   you're talking about his identification?
15           MR. CHIU:  Well, just whether it's contested that
16   the defendant does espouse those beliefs.  I mean, I don't want
17   to put on a dog and pony show of the defendant's beliefs,
18   because we don't want the jury to make their decision based
19   upon their agreement or disagreement with what the defendant
20   believes.  But his sympathy with the cause of the people that
21   are listed in the threats in the indictment is strong evidence
22   of motive for the defendant, so that's why we would want to
23   present evidence of that.
24           MR. HENDERSON:  That kind of takes us full circle as
25   to I can see their argument insofar as motive, 404(b) evidence,

 1    they bring in what they want to bring in that says he was

 2    rallying the support of this group.  If the jury gets that

 3    evidence and gets the instruction that this sort of evidence

 4    can be used to show motive, I think that the jury must be

 5    clearly told -- unless there is sufficiently similar proof as

 6    far as identity, they cannot use that evidence to show

 7    identity.  If they want to use it to show motive, lack of

 8    mistake, those sorts of things, I think that the Court, if it

 9    allows the evidence, should instruct them on it.

10            THE COURT:  That's why they say they're offering

11    that evidence.  It's a different -- it is a different category,

12    I think.

13            MR. CHIU:  And, Your Honor, we would argue that --

14    I mean, that's not even truly 404(b), other acts or crimes or

15    wrong evidence.  I mean, we would equate it to a situation

16    where, you know, there's a crime and the suspect is -- you

17    know, is described in a certain way, described wearing a black

18    jacket or described, you know, as tall or short.  It just so

19    happens that the description of the person that would be doing

20    this is extremely inflammatory.

21            Obviously, we understand that.  But we would submit

22    this isn't other acts evidence at all.  It's not really other

23    wrongs or crimes.  This is just the fact that there is somebody

24    who made these threats who appears to sympathize with these

25    individuals that they're making threat on behalf.  And we

1   submit we would have the right to show evidence that the

2   defendant does sympathize with those individuals.

3            THE COURT:  Which is motive.

4            MR. CHIU:  It is motive, but it's not an other act,

5   as 404(b).  It's not like we would be admitting evidence of

6   crimes and wrongs.  It's just the fact that the defendant does

7   espouse a certain belief.

8            THE COURT:  That's all right.  You wouldn't object,

9   then, to the curative instruction that Mr. Henderson requests.

10           MR. CHIU:  Yeah.  And frankly, we would ask for that

11  curative instruction.

12           THE COURT:  Okay.  I need to take a break just for a

13  minute to take up another case.  I think the attorneys are here

14  in that case.  So do you have the file down there, Darlene, or

15  did I leave it in the office?  I thought I would be taking a

16  break.

17       (Recess from 3:04 p.m. to 3:16 p.m.)

18           The next area that Mr. Henderson identifies is the

19  evidence of defendant's previous conviction for soliciting a

20  crime of violence and the facts supporting that conviction.

21           MR. CHIU:  Yes.  And, Your Honor, since we briefly

22  addressed the Court last week, I sort of looked at that.  And

23  I think I've come up with a way to kind of sort of have that

24  not be as prejudicial.  We would basically seek to introduce

25  evidence -- the evidence underlying that conviction is

1   basically this, that the defendant posted on his web site,

2   overthrow.com, which was his -- you know, which he publicly

3   sort of claimed as his own, the name, information, and the

4   family members and address of the juror on the Judge Lefkow

5   case.

6           We would submit that we would introduce evidence

7   simply that he posted information of a person involved in a

8   prosecution, in someone else's prosecution.  The defense in

9   that case, by the way, was not identity.  It was a First

10  Amendment defense that this wasn't a solicitation.  It wasn't a

11  threat.  So the evidence we would put on is that -- as modus

12  operandi evidence.  And this would be straight 404(b) evidence

13  that the defendant posted the names, family members and, you

14  know, address and personal information of someone who was

15  involved in a prosecution which he didn't agree with.

16          THE COURT:  Mr. Henderson.

17          MR. HENDERSON:  Your Honor, factually, that is very

18  dissimilar to what we are dealing with here.  That was a

19  prosecution that had transpired.  This was a juror that was on

20  that case that rendered a verdict.  Information came out at a

21  later point in time.  Mr. White was at that time using the

22  overthrow.com as a newspaper, if you will.  It was a public

23  forum that he put that information out there.  He published it.

24  And that was the basis of his conviction for that was putting

25  that information there.

 1          The circumstances are entirely different than what

 2  happened here.  The threats that came here were sent to private

 3  individuals.  Some were sent to other places, but they were not

 4  -- one, they were not by Mr. White.  They were not signed by

 5  Mr. White.  They were not attributed to Mr. White.  And this

 6  occurred -- there was I guess an ongoing prosecution, but there

 7  was not a trial that was involved.  It had nothing to do with a

 8  threat to a juror in this case, so.

 9          THE COURT:  Okay.  Are those the only issues I have?

10          MR. CHIU:  I believe that's it, Your Honor.

11          THE COURT:  Well, it's certainly an unusual -- the

12  facts are unusual.  The issues are unusual.  I can't say that

13  I've seen anything quite like that before.  But I'll get with

14  you as soon as I can.  I can't promise you anything much before

15  trial, but I'll get with you as soon as I can.

16          MR. HENDERSON:  Thank you, Your Honor.

17          MR. CHIU:  Thank you, Your Honor.

18          MR. HENDERSON:  And I will file a proposed voir

19  dire, a specific voir dire that deals with the issues of the

20  case.

21          THE COURT:  Yes.  And run it by the government

22  first.

23          MR. HENDERSON:  I will.

24          THE COURT:  You all can do that jointly.  Tell me

25  the questions you want me to ask jointly.  That would be good.

1          MR. CHIU:  Yes, Your Honor.

2          THE COURT:  Okay?  Have a good day.  Thank you.

3          MR. CHIU:  Thank you, Your Honor.

4          MR. HENDERSON:  Thank you, Your Honor.

5       (Adjourned at 3:25 p.m.)

6               - - - - - - - - - - - -

7            Certificate of Official Reporter

8  I hereby certify that the foregoing is a true and correct

9  transcript of the proceedings held in the above-entitled

10 matter.

11

   s/Koretta Stanford, RMR, CRR
12 _____
   Official Court Reporter
13 United States District Court
   Middle District of Florida
14
   Date:  February 5, 2015
15

16

17

18

19

20

21

22

23

24

25