```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION

 3                  Docket No. 6:13-CR-304

 4   . . . . . . . . . . . . . . .
     UNITED STATES OF AMERICA    :
 5                               :          Orlando, Florida
              Plaintiff          :          September 12, 2014
 6                               :          8:35 a.m.
                  v.             :
 7                               :
     WILLIAM A.WHITE             :
 8                               :
              Defendant          :
 9   . . . . . . . . . . . . . . .

10

11              TRANSCRIPT OF JURY TRIAL, VOLUME V
               BEFORE THE HONORABLE JOHN ANTOON, II
12                 UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   For the Plaintiff:  Vincent Chiu

17                       James D. Mandolfo

18

19
     For the Defendant:  Larry B. Henderson
20

21

22   Court Reporter:    Amie R. First, RMR, CRR
                        AmieFirst.CourtReporter@gmail.com
23

24   Proceedings recorded by mechanical stenography.

25   Transcript produced by Computer-Aided Transcription.
```

```
 1                    P R O C E E D I N G S
 2           THE COURT:  Mr. Henderson, what material issue of
 3    fact is there regarding venue, regarding the question of
 4    venue?
 5           MR. HENDERSON:  Whether any of the acts that
 6    constitute the crime occurred in the Middle District of
 7    Florida.
 8           THE COURT:  That's really a legal argument, isn't
 9    it?
10           MR. HENDERSON:  It's a factual argument, Your
11    Honor.  There is a requirement that venue be proved.
12           THE COURT:  Well, the question is whether --
13    there's no question that the intended -- that the people
14    targeted in the alleged extortionary communications were in
15    the Middle District of Florida, right?
16           I mean, I'm talking about facts, not law.  I
17    understand you're saying -- at least I understood you
18    yesterday saying you took the position that the crime is
19    complete when the communications were sent to the Southern
20    Poverty Law Center and Anti-Defamation League.
21           MR. HENDERSON:  That's our motion.
22           THE COURT:  There's actually a question of law
23    whether it continues beyond that.  It's not a question of
24    fact.
25           MR. HENDERSON:  Well, I submit it is a question of
```

1   fact.  I must disagree with the Court.  I think that the

2   crime itself is fully completed when the communication is

3   sent from one site to another.

4           THE COURT:  But that's not a fact.  That's law.

5   That's a legal argument.

6           What fact, what controverted fact, is there that

7   pertains to venue?

8           MR. HENDERSON:  That the crime occurred within the

9   Middle District of Florida.

10          The transmission of the communications from Mexico

11  to Alabama, from Mexico to New York, the testimony is

12  there's no service by Microsoft inside the State of

13  Florida.  That crime was complete as soon as --

14          THE COURT:  That's a legal argument.  That's not a

15  factual argument.

16          MR. HENDERSON:  Well, as a matter of fact, that's

17  where the crime occurred.

18          Now, the collateral consequences of the crime

19  being committed in Alabama and in New York content-wise --

20          THE COURT:  What factual issue do you want the

21  jury to resolve with regard to venue?

22          MR. HENDERSON:  The factual issue is whether --

23          THE COURT:  I'm prepared to make a finding venue

24  is proper in the Middle District of Florida, at least with

25  regard to the issue of the case where Judge Komanski saw

1   the Email.  I'll take up the other in a second.

2          But as a matter -- if I take the facts in the

3   light most favorable to the Government, I find that there

4   is venue looking at comparable statute and case law and

5   Wright & Miller and all the research I've done, because you

6   guys didn't help me much yesterday.

7          So I'm going to make that observation as a matter

8   of law.

9          But what I need to know from you, because you're

10  saying you're entitled to a jury instruction --

11          MR. HENDERSON:  I believe so.

12          THE COURT:  I think there's law saying that you're

13  entitled to a jury instruction perhaps, although there's an

14  argument that it's waived -- but I'm going to hear from the

15  Government on that -- only if there's an issue of fact, and

16  I don't know what the issue of fact is.

17          MR. HENDERSON:  I believe that there is no

18  evidence showing that the crime was committed inside the

19  Middle District of Florida.

20          THE COURT:  Okay.  That's not helpful.

21          Anything else?  You're just saying the same thing

22  over.  We have limited time.  So if you haven't given me

23  any argument then --

24          MR. HENDERSON:  If there is nothing in furtherance

25  of the crime that occurred in the Middle District of

1    Florida, then venue is not proper here.  But it's a

2    question of fact for the jury to determine.

3              THE COURT:  What fact?

4              I'm going to ask one more time.  And then if you

5    can't answer it -- I appreciate your position here,

6    Mr. Henderson.  So I'm not trying to be hard on you, but

7    I've got just a few minutes to do this.  And it's not my

8    fault.  It's counsel's fault on both sides for various

9    reasons.

10             But I need you to tell me, if you can, what fact

11   you dispute with regard to these communications?  What fact

12   the Government has alleged do you take issue with?

13             MR. HENDERSON:  That anything in the furtherance

14   of the commission of that crime occurred within the Middle

15   District of Florida, and the crime being the sending of

16   threat by foreign or interstate commerce.

17             THE COURT:  Okay.

18             MR. HENDERSON:  Or extortion or for any other

19   purposes.

20             THE COURT:  Okay.  Thank you.

21             The Government, which -- was it the

22   Anti-Defamation League sent the message to Central Florida

23   and to the Middle District of Florida and Judge Komanski

24   opened it?

25             How about the other one?

1          MR. CHIU:  Well, actually, what it was, it was the

2   -- the Anti-Defamation League published, or the comment was

3   published on the Anti-Defamation League website, which

4   Judge Komanski accessed to view.  That's how Judge Komanski

5   saw that.

6          There was no direct communication between the

7   Anti-Defamation League and Judge Komanski.

8          THE COURT:  Okay.  How about the other one?

9          MR. CHIU:  The other one, the Southern Poverty Law

10  Center screened out the comment before it was put on the

11  website and then conveyed that over to authorities in the

12  Middle District of Florida through Yvonne Plasencia and the

13  initial case agent, Michele Krempa.

14         THE COURT:  What do you say regarding venue?

15         MR. CHIU:  Your Honor, we would submit that

16  there's no difference between the ADL threat and the

17  Southern Poverty Law Center as a matter of law.

18         As a matter of fact, it's slightly different in

19  terms of how the message arrived, but our position would be

20  that Heidi Beirich, who testified with the Southern Poverty

21  Law Center, essentially acted as the out-of-state server

22  that conveyed the message into the Middle District of

23  Florida.

24         The fact that it was a human transfer as opposed

25  to a mechanical transfer of -- I couldn't find anything

 1    that would draw a distinction between the two.

 2            THE COURT:  Okay.  Looking at Wright & Miller, I

 3    see this.  And, of course, there's authority cited and I've

 4    looked at the underlying authority.

 5            Venue is an issue and becomes a question of fact

 6    for the jury when there is a genuine issue of material fact

 7    on proper venue and the defendant makes a timely request

 8    for the instruction.  Whether there was sufficient evidence

 9    to justify a finding on venue is a question of law for the

10    court.

11            And from United States versus Perez, 280 F.3d 318,

12    the failure to instruct the jury to determine whether that

13    venue is proper is reversible error only when, one, the

14    defendant objects to venue prior to or at the close of the

15    prosecution's case; two, there is a genuine issue of

16    material fact with regard to proper venue; and, three, the

17    defendant timely requested a jury instruction.

18            You have a jury instruction?

19            MR. HENDERSON:  I do, Your Honor.

20            THE COURT:  You can give it to our clerk.

21            From United States versus Fahnbulleh, which comes

22    from the District of Columbia Circuit, 752 F.3d 470, it is

23    established law in this circuit with respect to venue

24    instructions that a venue instruction is necessary only

25    when a question of venue is genuinely in issue.

```
 1            Various courts have dealt differently with the

 2    question of when venue is at issue so as to require an

 3    instruction.

 4            In Haire, we expressly adopted and followed the

 5    Third Circuit's analysis in Perez, concluding that the

 6    instruction is necessary only when the question of venue is

 7    genuinely an issue.

 8            And then from the Eleventh Circuit in Roberts, at

 9    308 -- United States versus Roberts, 308 F.3d, a defendant

10    may waive such right, referring to the right to have this

11    case tried in the appropriate venue, both guaranteed by the

12    Constitution and by the rules of criminal procedure.

13            However, by failing to raise a venue objection

14    prior to trial, because defendant was aware of the grounds

15    underpinning his objection well before the prosecution

16    rested, which no doubt explains why his attorney did not

17    represent to the Court that he did not become aware of

18    those grounds until the prosecution rested, the Dabs

19    (phonetic) exception does not apply in appellant's claim to

20    the case should have been brought in another forum.  The

21    argument fails.

22            You want to comment, you want to argue why the

23    defendant should not receive an instruction?  Or do you

24    agree that he should receive an instruction?

25            MR. CHIU:  Your Honor, I don't believe the
```

```
 1   defendant should receive an instruction.  There is no

 2   material issue of fact.

 3           I don't believe it is controverted that

 4   Miss Beirich or that the Southern Poverty Law Center Email

 5   went to the Southern Poverty Law Center and Miss Beirich

 6   then conveyed that Email on.

 7           And I don't believe there's any factual issue that

 8   Judge Komanski accessed the Anti-Defamation League website

 9   from the Middle District of Florida and observed the threat

10   in count four.

11           THE COURT:  There is no venue statute, venue

12   provision in the statute under which the defendant is being

13   prosecuted.

14           Related to -- and looking at 3237, there is some

15   assistance.  And then case law.  There's the case of United

16   States versus Kibler, which is at 667 F.2d 452, involving a

17   conviction for endeavoring to intimidate a witness in a

18   judicial proceeding, and I think that is analogous to what

19   we have here.

20           That court found that venue lies in the district

21   where the judicial proceeding that the accused sought to

22   affect is pending.

23           And in United States versus Frederick, at 835 F.2d

24   1211, involving a prosecution for witness tampering, the

25   Seventh Circuit determined that proper venue is not limited
```

1    to districts where defendants were physically present when

2    they committed unlawful acts, so long as an overt act in

3    furtherance of the conspiracy is intended to have an effect

4    in the district where the case is finally brought venue is

5    proper.

6            Of course, all of this is consistent with 3237 as

7    well.

8            There's a similar case out of the Eighth -- out of

9    the Sixth Circuit, U.S. versus O'Donnell, at 510 F.2d 1190.

10           Mr. Chiu, what is your position regarding the

11   question of whether there's been waiver -- do you have any

12   authority on waiver besides what I just recited?

13           MR. CHIU:  No.  Besides that, what I mentioned,

14   recited to the Court yesterday, which is essentially the

15   same as what the Court said.  No additional.

16           THE COURT:  And what is your position regarding

17   what constitutes appropriate venue?  Do you have anything,

18   any authority in addition to what I just referred to?

19           MR. HENDERSON:  We mentioned yesterday the case --

20           THE COURT:  Hold on a second.  I'm talking to him

21   right now, Mr. Henderson.

22           MR. HENDERSON:  Sorry.

23           THE COURT:  Mr. Chiu?

24           MR. CHIU:  Not in addition.

25           THE COURT:  Mr. Henderson?

1          MR. HENDERSON:  I'm sorry.  We mentioned yesterday

2    the case of United States versus Snipes, 611 F.2d 855.

3    It's an Eleventh Circuit case from 2010.  Venue was an

4    issue.

5          I think clearly under the Fifth --

6          THE COURT:  Was it a factual issue?  Was there a

7    factual issue in Snipes?

8          MR. HENDERSON:  There was a factual issue.

9          THE COURT:  What was the factual issue in Snipes?

10         MR. HENDERSON:  The communications that were

11   involved in Snipes was an income tax return with the

12   information that was used, as to whether or not that

13   information, the crime occurred inside the Middle District

14   of Florida, in the Ocala area.

15         And the Court held, we review for abuse of

16   discretion this court's denial of the pretrial motion for

17   the evidentiary hearing to determine venue.

18         The Court said, however, we review Snipes'

19   argument that the denial of a pretrial evidentiary hearing

20   violated his Fifth Amendment rights de novo.

21         He's asserting venue is not here; it should be at

22   another spot.  The Court there in Ocala said you do not

23   have an evidentiary hearing on venue.

24         The Eleventh Circuit continued, it's by now well

25   established that venue is an essential element of the

1    Government's proof at trial.  Questions of venue are not

2    taken lightly.

3           I omit the citation.  The Constitution, the Sixth

4    Amendment, and Rule 18 of the Federal Rules guarantees the

5    defendant the right to be tried in the district in which

6    the crime was committed.

7           And it's our position, Your Honor, that the crime

8    was not committed in --

9           THE COURT:  What happened with Snipes?

10          MR. HENDERSON:  He was convicted.

11          THE COURT:  Was the conviction reversed?

12          MR. HENDERSON:  It was.

13          THE COURT:  There was never a request for an

14   evidentiary hearing here.  This issue was brought up at the

15   close of the Government's case.  And I have yet to hear

16   what issue of fact exists in this case.  It seems to be

17   only a question of law.

18          I'm not ruling at this point.  I'm going to decide

19   whether to give them an instruction, and I'll --

20          MR. HENDERSON:  The Court asked if Mr. Snipes'

21   conviction was reversed.  Not in reference to this.  They

22   affirmed his conviction.  It affirmed the trial court's

23   exercise of discretion, saying you do not get an

24   evidentiary hearing in advance of trial when you contest

25   venue.  That's the issue there.

```
 1            THE COURT:  Okay.

 2            But we also have Roberts from the Eleventh Circuit

 3   that seems to say that it has to be raised pretrial, at

 4   least prior to the Government resting its case.

 5            Do you have anything that you want to present with

 6   regard to count six?

 7            MR. MANDOLFO:  Nothing further from the

 8   Government, Your Honor, other than what we discussed

 9   yesterday as far as the statute, statutory authority.

10            Again, as I said yesterday, even if you look at

11   18, U.S.C., 1029, it provides what an unauthorized access

12   device is.  That's possession with the intent to defraud,

13   if you had a credit card.

14            That's not in 1028(a).  I believe that based on

15   Congressional intent, Your Honor, we can read the statute

16   and/or that these facts fit within the crime.

17            THE COURT:  I disagree with your -- with your

18   understanding of Congressional intent.

19            And I -- you know, I wonder why you would

20   compromise the integrity of your case by including that

21   count.

22            But so far I have not been able to say that it's

23   -- that the facts alleged are outside of the scope of the

24   statute.  So I'm going to reserve ruling on it and see if I

25   can find something on my own.
```

```
 1              Did you present anything in writing on that issue

 2   this morning?

 3              MR. CHIU:  No, Your Honor, I did not.

 4              THE COURT:  Okay.  May I see what Mr. Henderson

 5   gave you?

 6              THE DEPUTY CLERK:  Yes, Judge.

 7              THE COURT:  Have you looked at Mr. Henderson's

 8   instruction?

 9              MR. CHIU:  Yes, Your Honor.  The venue

10   instruction?

11              THE COURT:  If I gave an instruction, do you have

12   any objection to that?  I would change it to -- I would

13   change it, at least to refer maybe to just Orange,

14   Seminole, and Osceola, the surrounding counties.

15              MR. CHIU:  Yes, Your Honor.

16              First of all, the -- under the Roberts case, I

17   believe the Eleventh Circuit was clear that the standard

18   for venue was actually not beyond a reasonable doubt.  It's

19   a preponderance of the evidence.

20              THE COURT:  Preponderance of the evidence, that's

21   correct.

22              MR. CHIU:  And this venue instruction,

23   particularly the last paragraph, it says it's sufficient to

24   satisfy this element if any act in furtherance of the crime

25   occurred within this district.
```

1    That's more an accurate statement of the law in

2    regards to a conspiracy count.  In this particular count,

3    that doesn't, for example, encompass the statute under

4    3237, which states that any offense begun in one district,

5    completed in another, or committed in one -- more than one

6    district, then venue is proper in that district.

7    Like I said, this is -- I think this is something

8    that's pertinent to a conspiracy where various, you know,

9    overt acts are occurring.  But in this case, I believe it's

10   an ill fit.

11   MR. HENDERSON:  Your Honor, we would have no

12   objection to modifying the number of counties that are

13   listed.

14   And we submit it would also be proper to instruct

15   the jury that that need only be proved by a preponderance

16   of the evidence, that is, that it is more likely than not

17   it occurred in the furtherance, in one of those counties,

18   words to that effect.

19   It's a simple instruction, preponderance --

20   MR. CHIU:  Your Honor, I guess also the concern

21   the United States has is that ultimately sending an

22   instruction back like this is really -- we're essentially

23   asking the jury to decide essentially the same legal issue

24   that we have been discussing this morning and yesterday

25   afternoon.

 1          THE COURT:  Okay.  I'll be back in a couple of

 2   minutes.

 3          MR. HENDERSON:  Your Honor, there's also an issue

 4   about the 403 instruction.

 5          THE COURT:  Do you have any authority on that?

 6          MR. HENDERSON:  I would simply ask for the pattern

 7   instruction on 403, the Eleventh Circuit.  I believe that

 8   covers --

 9          THE COURT:  404 or 403?

10          MR. HENDERSON:  404(b), excuse me.  The pattern

11   instruction on 404(b).

12          THE COURT:  How is the instruction that the --

13   that I have proposed different?

14          MR. HENDERSON:  S4 in the package I gave you.  If

15   it's included, then I certainly have no objection.  I did

16   request that instruction.

17          THE COURT:  No.  It was in the package I gave you.

18          (Recess at 9:02 a.m. to 9:06 a.m.)

19          THE COURT:  With regard to the only outstanding

20   issue in the case at this point for me, the question of

21   venue in counts four and five, I find that the objection to

22   venue was not timely raised.  Or the issue itself of venue

23   was not timely raised, as described in Roberts.  But even

24   if it were raised timely, that there is no issue of fact.

25          Essentially, I think Mr. Chiu is correct that by

```
 1   sending it to the jury I'd be asking them to make a finding
 2   that really is a question of -- goes to the question of
 3   law.
 4           So I'm not going to give that instruction.
 5           Is the jury ready?
 6           COURT SECURITY OFFICER:  Yes, sir.
 7           THE COURT:  Bring them in.
 8           (Jury entered the courtroom at 9:08 a.m.)
 9           THE COURT:  Good morning, ladies and gentlemen.
10           JUROR:  Good morning.
11           THE COURT:  Have any of you read or heard anything
12   about this case outside the courtroom since you left
13   yesterday?
14           (No response.)
15           Okay.  None of you read any local newspaper, I
16   take it, then?
17           JUROR:  No.
18           THE COURT:  Okay.  The attorneys will now have an
19   opportunity to address you and make their final arguments.
20   These arguments are not to be considered by you as evidence
21   and they're not your instructions on the law.
22           Nevertheless, the arguments are intended to help
23   you properly understand the issues and the evidence and the
24   applicable law, so you should give the attorneys your close
25   attention.
```

```
 1            We will take a break at some point during the
 2    arguments so that you can be refreshed and the court
 3    reporter can be refreshed.
 4            Mr. Chiu?
 5            MR. CHIU:  Thank you, Your Honor.
 6            If I may approach and gather some exhibits.
 7              CLOSING ARGUMENT BY THE GOVERNMENT
 8            MR. CHIU:  May it please the Court.
 9            THE COURT:  Yes, sir.
10            MR. CHIU:  Counsel, members of the jury.  It's
11    been a long week, and we've gone through a lot.
12            Now, let's put it all together.  You know, what
13    does this all tell us?  The story starts essentially in the
14    first week of May in 2012.  The defendant, William White,
15    was in Roanoke, Virginia.  We heard he decides to go to
16    Mexico.
17            Exactly when he gets there, sometime in the first
18    or near the first week of May.  We saw evidence from his
19    Facebook page on May 9, he said, I've escaped fortress
20    America.
21            Now, it's a Facebook page.  How do we know it's
22    his Facebook page?  You saw pictures of him on it.  You saw
23    stacks of conversations that were introduced and status
24    posts.  I'm not going to go over all of those items.
25            Some of that, you're going to get excerpts of that
```

 1   which Agent Majeski introduced.  You can look through them

 2   and you can decide for yourself, is this William White's

 3   Facebook page?

 4        And you're going to find that it is.  You'll find

 5   that it mentions his book and talks about personal matters.

 6   He has personal conversations.

 7        So he goes to Mexico in the first week of May.  On

 8   May 10, Thomas Bondurant, Judge Turk, and Tim Heaphy get

 9   packages in the mail.

10        First of all, who is Judge Turk?  Judge Turk is

11   the judge that presided over the defendant's case in

12   Roanoke.

13        Who is Tom Bondurant?  Tom Bondurant is the -- Tom

14   Bondurant is the Assistant United States Attorney that

15   prosecuted this case.

16        And Tim Heaphy.  Who is Tim Heaphy?  He's

17   basically Tom Bondurant's boss.  He's the U.S. Attorney in

18   Roanoke, Virginia.

19        Now, let me -- if I could use the ELMO, please.

20        So May 10, Judge Turk gets this book in the mail,

21   written by William White, and inside is written this note:

22   Be glad it's just a book, pig.

23        Tom Bondurant gets the same book.  Inside is

24   written this note:  Everything about you is known, pig.

25   Your queer daughter.  The affair with your neighbor.  It's

1    coming down fast.

2          And Tim Heaphy gets this book.  Eyes are on you,

3    with that note.

4          All right.  On May 12, 2012 -- and what we'll do

5    is we'll kind of go over what's happening here in the U.S.

6    And as that's happening, we'll look at what's happening on

7    the defendant's Facebook page.

8          On May 12, 2012, a couple of days later, defendant

9    makes -- or there's a post.

10          If you could pull up 7262, please.  If you could

11    go to the bottom part, please.

12          Well, that should get some attention.  Sometime in

13    the future -- and I think the back part is cut off.

14          If we could just come back out.  I'll read it out.

15          I am not sure when -- just leave the --

16          Sometime in the near future, I am not sure when, I

17    believe there is some hearing, I am not sure what, that is

18    going to cause a warrant for my arrest to be issued by the

19    United States.  C'est la vie.

20          To anyone who wants to support me as I reestablish

21    myself, all I can say is I need work and I need money.

22    Getting out of the U.S. into where I am without being

23    detected so far was very expensive.  I don't like begging

24    for money.  I'll leave it at that.  Paid writing work is

25    preferrable.  And yes, I am still writing for a lot of

1    publications -- can you go to 7263, please -- which gives

2    me some income.

3          Pull that down.

4          And two days after that, there's another post.  If

5    you could pull 7254, please.

6          I think the problem is that the screen is set over

7    to the right.  Is there a way to fix that, Miss Ragusa?

8          MS. RAGUSA:  The number again?

9          MR. CHIU:  7254, please.  Thank you.

10         I hate to call a victory early, but I have to

11   admit I'm surprised.  Over the past four days, a number of

12   newsworthy things have occurred.

13         And even if the Government was deliberately

14   concealing them from the press, they should have broken

15   this afternoon around 2:30 p.m., when one occurred in full

16   view of at least three television stations and a dozen

17   newspapers that had been following a certain story.

18         Instead of reporting the news, blah, blah, blah,

19   what it tells me is that what happened was unexpected and

20   is so far outside of the government's control right now

21   that rather than admit they are beaten, the government and

22   the news media have shut up, at least until they decide how

23   to spin things.

24         All right.  The next major thing that happens, on

25   May 18, 2012, at 10:21 a.m., the Email account,

1    nslf_helterskelter@hotmail.com is created.  It's registered

2    to the National Socialist Liberation Front, and it's

3    created by -- at someplace -- or it comes back to an

4    anonymized IP address.  We'll get back to all that.

5         Let's stick with the timeline.  About ten minutes

6    after this Email account was created, there's an Email that

7    goes to Judge Turk.  If we could pull up 8407, please.

8         There's an Email to Judge Turk.  It goes to three

9    media outlets and dhyphen@yahoo.com, which we've heard

10   testimony that that is Bill White's Email address.  And

11   it's registered to Bill White, or subscribed to Bill White.

12        If we can move to the next page, please.  I

13   believe that's 8408.

14        And this is the threat that's sent -- that's sent

15   out from that Email address.  On the evening of May 10,

16   2012, pig Judge James C. Turk.  And lists out the address

17   of Judge Turk.

18        Found the word pig written in the blood of his

19   goat.  God Christ all along his walls.

20        He also received a package of photos of the

21   piglets, mentioning Judge Turk's grandchildren, and a note

22   that if he proceeded with the pig proceedings against

23   righteous Neo-Nazi Bill White that those piglets would be

24   found beheaded, disemboweled, and hung from the overpass

25   over highway I-581.

1          It mentions the demands of the National Socialist

2     Liberation Front.  And we'll get back to that as well.

3          Demanding that Judge Turk cancel all further

4     proceedings against the, quote, wrongfully persecuted

5     Righteous Brother William A. White.

6          I mentioned similar messages are further delivered

7     to the homes of Tim Heaphy, Anthony Troy, and Thomas

8     Bondurant.  And we'll break down that Email in a little

9     bit.

10          But let's stay with the timeline.

11          So at 10:38 a.m., about seven minutes after that

12     Email goes out, that threat gets posted on the defendant's

13     Facebook page by the Bill White account.

14          If we could pull up 7247, please.

15          And before the posting of the Email threat, the

16     account writes, I received the following message today via

17     Email.  Given that I have not been in the United States for

18     several weeks, I obviously had nothing to do with these

19     events.

20          I just edited this to remove Turk's actual

21     address.

22          Now, on the next day, on May 19, Bill White likes

23     the American Front.

24          Can we go to 5642, please?

25          And the agent testified that when you like

1   something, for those of us that are not Facebook literate,

2   it means you basically go to a page and you say I agree.  I

3   stand with you, whatever.  Whatever you want to convey that

4   as.  But it basically says I like what's being said here.

5        At 2:03 that day -- now, this is important.  If we

6   could pull up -- if we could pull up 7244, please.

7        And let's see.  The middle of the page here.  I

8   guess the third paragraph.  Let's start with that.  All the

9   way down.

10        Okay.  Now, this is where it gets really

11   interesting for our case, or in relation to our case.

12        At 2:03 p.m., Bill White posts, certain parties

13   are seeking the names of the judges, federal prosecutors,

14   and F.B.I. agents involved in the American Front case.

15        Obviously, this information is not currently being

16   made available to the public.  If anyone who has access to

17   the paperwork could post the name of the judge sitting in

18   the case and the U.S. Attorneys involved in the prosecution

19   as well as the F.B.I. and JTTF officials involved, it would

20   be greatly appreciated.

21        And it goes on.  And I'm not going to insult your

22   intelligence by reading all of it to you.  But we'll

23   summarize.

24        A few minutes later he talks a little bit more, it

25   says, we all know the federal government is ultimately

1  responsible and they are the ones that are going to have to

2  be held primarily responsible and bear the consequences of

3  their actions.

4           At -- and you'll have to forgive me.  I'm not real

5  good at making this time translation, even though I've done

6  it enough at this point.

7           So at 2:17, he posts, all right.  The state people

8  are Kelly Boaz and Lawson Lamar.  Seconds later, he posts,

9  the state judge is Walter Komanski.  And then he posts a

10 bunch of stuff about Officer Boaz.

11          And if we could go to 7245, please.

12          And just the top, please.

13          Then he posts Kelly Boaz's address, and says, got

14 this guy and the entire family.  Verifying now.

15          Then later on here, he posts -- and this is about

16 2:58, I believe.  Wife -- or the name of his wife or

17 ex-wife, another relative, the kids.  Mr. Boaz's kids.  And

18 some other information about their ages.

19          At 3:16 p.m. -- I'll use this one here.

20          If we could switch to the ELMO, please.

21          3:16 p.m., or thereabouts.  You can tell by the

22 time stamp here -- I'm trying to focus that.

23          You can tell by the time stamp here, he posts a

24 picture of Lawson Lamar and his family, names of his family

25 members, including his grandchildren, which we've blacked

 1   out up here.  And you can see that up here.

 2          Puts his -- starts to list some of his address

 3   information, and that's at 3:20 p.m.

 4          At 4:12 p.m., less than an hour later, the Email

 5   threat that is in count one goes out.

 6          Miss Ragusa, if you can pull up 883 -- 8383,

 7   please?

 8          It comes from the nslf_helterskelter@hotmail.com

 9   account.  It says, dig this pigs or it's "Night of the Buck

10   Knives" for -- and it names Lawson Lamar's grandchildren.

11          If we go to the next page, please.

12          It -- and then this is the threat.  I won't read

13   it all to you.  And we'll go over it line by line more

14   thoroughly in a little bit.  But you've all seen this

15   several times already.  We won't belabor the point.

16          But I will note that the three individuals that

17   are threatened in this threat are the same three

18   individuals that were just listed on Bill White's Facebook

19   page, kelly Boaz, Lawson Lamar, and Walter Komanski, and

20   that the same information was the information that came

21   from or that was on Bill White's Facebook page.  And the

22   names, even, of the family members was what was found on

23   Bill White's Facebook page.

24          At 5:19 or so -- if I can go back to the ELMO.

25   I'm sorry.

1         Let's see from the previous page.  It shares the

2    link to -- look up here.  Judge Walter Komanski.  And his

3    address.  Although that's blacked out as well.

4         And then underneath that, with the time stamp, it

5    says, state judge in the American Front case.

6         It's hard to see.  I apologize.

7         Now, at 5:56, there's a link to a music video.  If

8    we could pull up 7244, please.

9         We'll call it effed with a knife, although that's

10   not obviously what -- that's paraphrasing.

11        And that link is right here as the second entry.

12        Then we find later on, find that Email -- or I'm

13   sorry, find that song by Cannibal Corpse on Bill White's

14   MP3 player which he had with him in Mexico.

15        8:39 p.m., since we have this up, Bill White posts

16   the fact that someone throws on a black robe and sits on a

17   bench and orders men to kidnap and torture others does not

18   make what he calls the law legitimate.  It is just as

19   legitimate to go to the home of the man in the black robe,

20   kidnap, and torture him.  There is no moral distinction.

21        All right.  Next day, 2:35 p.m., the same threat

22   which we just sent you, goes back out, but goes to

23   different people.

24        If we could pull up 8385, please.

25        Who does it go to?  It goes to dhyphen@yahoo.com.

1    To Bill White, Bill White's Email address, and some news

2    outlets.

3          Eight minutes later or so, at 2:43 p.m., that

4    Email gets posted on Bill White's Facebook page.

5          If you could pull up 7241, please.  Right here.

6    Yes.  Actually not this comment.  Above it.  Yeah.

7          Just received an Email.  Seems that some Neo-Nazi

8    terrorist hatemongers are being active on the Internet.

9    These hatemongers must be pretty organized.  I wonder how

10   they get this kind of information.  I don't know about you,

11   but if I was Lawson Lamar, I might do what they said.

12         And certainly we can all appreciate the sarcasm

13   with which he says, I wonder how we get all of this

14   information.

15         All right.  At 3:55 and 4:14 p.m., there's posts

16   of Thomas Lamar's family information.

17         And I'll -- if we could pull up 7242, please.

18         It's a link to his website for his business, and

19   partial address.  Home address.

20         Now, at 4:24 p.m., about ten minutes later, after

21   that partial address is posted, there's another threat.

22   Who does this go to?  It goes to Tom Lamar.

23         If we could pull up 8387, please.

24         It goes to Tom Lamar at the company that just was

25   posted on Bill White's Facebook page.

1          If we could pull up 8388, please.  Actually, if

2     you could show that -- if you could just blow up the text,

3     please.

4          We'll break this down.  We'll break this down in a

5     little bit.  But, again, you've seen this post probably

6     several times during the course of this trial as well, so

7     we won't -- I won't belabor that point.

8          But suffice to say, it's the same -- it's a

9     similar threat, but now it's sent to the attention of Tom

10    Lamar but directed at Lawson Lamar, to get Lawson Lamar to

11    drop the cases against the American Front.

12         All right.  6:36 p.m., Bill White posts the

13    National Socialist Liberation Front manifesto.  That's at

14    7240, please.  At the bottom.  Yes.

15         All right.  The National Socialist Liberation

16    Front.  Where do we recognize that from?  That is the

17    subscriber for the Email address

18    nslf_helterskelter@hotmail.com.  We're going to call it the

19    helter skelter account for short.  National Socialist

20    Liberation Front, NSLF.

21         Now, at 7:22, the defendant attempted to post that

22    same threat on the Southern Poverty Law Center website.

23         If we could pull that up on 8418.

24         It's the same threat.

25         You don't have to blow it up.

1          It's the same threat you saw before.  And you've

2   seen it a couple of times.

3          At 7:37, the post -- there was a post of that same

4   threat on the Anti-Defamation League website.

5          It's at 8389, please.  And if we go to 8390.

6          So here's the article.  And there's the threat in

7   the comment section following it.

8          On May 21 -- let's go to 8402.  Oh, I'm sorry.

9   Yes, 8402.  If we could blow up this long block of text,

10  please.

11         And this is the post that actually led agents to

12  Bill White.

13         It talks about, if I may say something unpleasant,

14  there is no peaceful solution to the terrible acts of

15  violence that the federal government and the government of

16  Florida have engaged in in this case.

17         And this is, as you've heard, a website dedicated

18  to the American Front defendants.

19         People have to make a decision.  Either the laws

20  of the United States and Florida are valid, and thus these

21  arrests and the torture and phony confessions that

22  inevitably follow in these kinds of cases are valid, or the

23  system is not valid and it's just a group of people engaged

24  in kidnapping and the use of force.

25         If this case is not valid, someone needs to go to

1    the homes of these pigs, and since you don't have a prison

2    to keep them in, you need to kill them and kill anyone

3    associated with them until they give you what they want.

4         That's my opinion.  Expressing that opinion is a

5    crime, which it isn't, and I've probably just broken the

6    law.

7         But I've posted some of the information on how to

8    find these pigs on my Facebook profile, and I know some

9    letters have already gone out to Kelly Boaz, the officer

10   who made the arrests; Lawson Lamar, the prosecutor who is

11   deciding whether to bring charges; and Walter Komanski, the

12   judge who is detaining them.

13        Three minutes later, the defendant was posting --

14   if we could go to 7240.  Actually, just the top part.

15        So the defendant is commenting on somebody who has

16   gotten out of prison, and they talk about -- and some of

17   the people start talking about gun laws.  And what's

18   important is this line at the -- near the bottom.

19        We don't need to change the laws.  This is posted

20   by Bill White.  We need to off the pigs who made them.

21        And then what you saw in the last exhibit, and I

22   won't bother going back to it, about 25 minutes later, the

23   defendant, or Bill White, links to the Anti-Defamation

24   League website on the Free Stockdale and American Front 14

25   Facebook page, and links to that article that you saw the

1   threat on.

2         Okay.  Let's keep moving.  At 10:49 -- let's go to

3   7239, please.  Bill White posts -- hold on.  Bill White

4   posts -- if we could get the bottom post to the end.

5         When the F.B.I. wants to frame a political figure

6   and the media knows the person is completely innocent,

7   blah, blah, blah.  But when the same person goes out -- and

8   this is about four lines down.

9         When the same person goes out and actually and

10  openly commits serious crimes, like just gutting someone

11  with a 10-inch razor saw or smearing blood all over a

12  federal judge's walls, the media just shuts up.  Go out and

13  peacefully and legally protest something, blah, blah, blah.

14        If we go a couple of lines down, here in the

15  middle.

16        But go to a federal official and tell him you're

17  going to kidnap his grandkids and "F" them with knives and

18  sit outside his house observing the local S.W.A.T. team and

19  marshals as they vainly attempt to provide protection, and

20  the media just sits there shaking in terror.

21        He's just begging for attention.  Not getting

22  enough of it, apparently.

23        The pigs are happy to report on imaginary threats

24  to their regime.  Create a real threat to the regime, and

25  they just shut up in terror.

1          If we could move on to 7233.

2          Possible tropical storm here in Florida.  This is

3  May 24.  Possible tropical storm here in Florida this

4  weekend.  Guess we'll have to get the killing in before it

5  starts to rain.

6          Who are the only people that are in Florida in any

7  of these Facebook posts?  Lawson Lamar, Judge Komanski,

8  Kelly Boaz.

9          Let's go to 7231, please.

10          If we could start with the top one, please.

11          May 25, I believe the federal American Front

12  arraignments began today.  We should have the names of the

13  judges and prosecutors and the lead agents by day's end,

14  right?

15          Goes on to comment.  Nothing on Pacer.  Have the

16  feds again given into terrorism?

17          Now, on 5/26, May 26, 2012, there is another sort

18  of thing that's happening off to the side that nobody knows

19  about.

20          If we could pull up Bates number 8409, please.

21          This is what Agent Majeski introduced.  It's a

22  draft Email from the nslf_helterskelter@hotmail.com

23  account.  To cdonelson@hotmail.com.  Subject, Righteous

24  Brother White.

25          If we could go to the next page, please.

```
 1          Dig it.  And it gives the first name of Ron
 2   Donelson's wife.
 3          Heard your pig husband was looking for the
 4   Righteous Brother William A. White.  Well, I just so happen
 5   to know where he is.  He was outside your house a few
 6   minutes ago.  Gives the address.  But just headed over to
 7   the high school to check on your kids.  Hope that helps.
 8          Who is Ron Donelson?  Ron Donelson is the
 9   U.S. Marshal in Roanoke who had the misfortune of being
10   quoted in the newspaper.  About who?  About Bill White.
11          Okay.  Let's go to 7223, please.
12          May 28, "Roanoke Times" is now blocking TOR so
13   that people who support me cannot send anonymous comments
14   to their editors and post such comments on their webpages.
15          We can go down further, too.  To experience what
16   I've experienced -- this is about halfway down -- and to
17   know that the "Roanoke Times" was cheering it on, in my
18   mind justified murdering everyone involved in their
19   newspaper, just as what happened to me justified murdering
20   everyone involved in the American judiciary and federal law
21   enforcement.
22          Let's go down, a little bit further down.  The
23   American people -- and this is sort of like right there.
24          The American people must take up arms and murder
25   everyone associated with the American federal government.
```

1    The judges and the lawyers and the agents and the marshals

2    have no fear of the law or any legal repercussions for

3    their actions.

4            Only when they are dying in their homes or facing

5    a real threat of dying in their homes do they even stop to

6    consider that what they are doing may be wrong and may have

7    consequences.

8            And then in the comments, he adds, it's an

9    IP level block which doesn't ultimately work with TOR.

10           So he's talking about "Roanoke Times" blocking

11   TOR.  That's at 1:08 a.m.

12           If we could pull up Bates Number 8415, please.

13   And if we could focus on this bottom piece here.

14           So that was at 1:08 a.m.  Fourteen minutes later

15   or so 1:22 a.m., a post was made to the "Roanoke Times"

16   from Charlies effing Manson at Nimbusters.org,

17   nslf_helterskelter@hotmail.com.

18           You heard the person from Berkshire Hathaway

19   testify that all of that information is just what you

20   enter.

21           Dig, pig, you thought it was funny to laugh when

22   Righteous Brother White was tortured.  Now, White is

23   missing and the family is cruising house to house with

24   knives looking for pigs who are going to pay the price in

25   blood.  Who will be laughing when we smear the word pig in

1    blood on your wall.

2         Daughter?  What's a daughter?  And it goes on to

3    say more vile things which we really don't need to dignify

4    at the moment.

5         But who is Dan Casey with the "Roanoke Times?"

6         Let's move on actually.  8416.

7         Now, submitted on later that evening, should Dan

8    Casey be cut up with knives?

9         Later on, by nslf_helterskelter@hotmail.com, when

10   we're done with you, Dan, there won't be enough of you left

11   to plant.

12        Prediction, Dan Casey will be sodomized with a

13   meat hook.  Jack Ripper.  Nimbusters.  Pig, we're going to

14   cut your testicles off, fry them in batter and make you

15   crunch.

16        And then another one, David Berkowitz with

17   nslf_helterskelter@hotmail.com -- I'm not even going to

18   read that one out loud.

19        8417, please.

20        2:49, more from nslf_helterskelter@hotmail.com,

21   from boydrice@boydrice.com.  And you remember that the

22   agent testified that Bill White liked the Boyd Rice

23   Facebook page earlier that month.

24        Charlie effing Manson.

25        All right.  Let's move on.  If we can go to 7221,

1    please.

2         May 28, more references back to the American Front

3    case, talking about how the -- basically he's looking for

4    the federal judge and the prosecutor, and the F.B.I.

5    agents.

6         Now, I want to focus your attention on the bottom

7    here.

8         To my knowledge, the Florida state officials have

9    still not complied with the demand to release the

10   prisoners.  Does anyone have any thoughts?

11        Let's go to 7215, please.

12        This is the next day.  Or I'm sorry.  This is

13   later that day.

14        Someone correct me if I'm wrong, but was the

15   planned federal arraignment of the American Front canceled

16   today?

17        Go to the next day, 7214, please.

18        Unless I am mistaken, does not look like the

19   federal government -- it does look like the federal

20   government has chosen not to bring charges against the

21   American Front 13 until they feel like they have "control"

22   over the people who have said they will cut up with knives

23   anyone involved in the American Front prosecution.

24        They are also exhausting their limited bodyguard

25   budget protecting the homes of the three Florida officials

1    involved and their children/grandchildren.  As noted also,

2    political terror is working pretty well to resolve a

3    situation that could not have been resolved peacefully or

4    legally.

5            Let's go to 531.  Two days later.  7205, please.

6            He goes on another rant.  What I want to focus

7    your attention on, though, is the bottom part, starting

8    with about four lines up.

9            The government will not stop -- I'm sorry.

10   America -- let's see.  Let's strike that.

11           White people need to start preparing to fight the

12   American government in the abstract and start fighting it

13   in the concrete by finding the individual people who

14   compose it and who compose the media structures who support

15   it -- like the "Roanoke Times" -- and smearing them and

16   their blood all over the walls.  The government will not

17   stop what it is doing until it and the people who support

18   it start dying.

19           Let's go to 493, please.  I'm getting to the end.

20   0493.

21           June 2, Bill White shares another link to the

22   information of Kelly Boaz, Lawson Lamar, and Judge

23   Komanski.

24           Let's go to 783, please.

25           June 6 -- now, I point this out to ask yourself

```
 1   whose voice is it in these Emails.  This is a private
 2   message to somebody else.
 3            You want to fight?  Authored by Bill White here.
 4   Go get a sharp knife, and I'll send you some pigs' address.
 5   Cut them up and smear helter skelter on the wall.
 6            Let's go to 471, please.  Let's go -- I'm sorry.
 7   Let's go down to the bottom.
 8            This is a good idea.  It talks about Mark Potok's
 9   house, which, incidentally, Mark Potok works for the
10   Southern Poverty Law Center.  Again, I'm not going to read
11   that out.
12            And then another threat, sort of, or a reference
13   at least to a graphic image involving Lawson Lamar's
14   grandchildren.
15            Go to 471, please.  Oh, we're already on 471.  If
16   we could go to the top, please.
17            I'm not going to read all of this through, but
18   this is the post on June 7, where Bill White posts about
19   using TrueCrypt and using TOR to encrypt your computer and
20   to hide your IP addresses.
21            Let's go to 467, please.
22            June 8, this is the day he was arrested.  All
23   right.
24            Now, my computer system and Internet is so secure
25   the NSA itself couldn't crack it, no matter what.
```

1          Actually, if we could go back to that.

2          He also asks, where do I get some encrypted chat

3     other than the CAT?

4          Whatever that is.

5          So that's the timeline.  I know that was kind of

6     long and winding, but let's just -- let's break down the

7     Email to -- let's break down the Emails real quick.

8          8384, please.

9          All right.  Okay.  Pigs.  Dig this --

10         Start with the top half.

11         Okay, pigs.  Dig this and dig it well.  Pigs and

12    dig.

13         That's from the lyrics from "Night of the Buck

14    Knives."  You've got the lyrics to that.  It's Exhibit 34.

15    I won't put it up right now.

16         This is Joe Tommasi.  Who is Joe Tommasi?  Joe

17    Tommasi, you heard, was the leader of the National

18    Socialist Liberation Front.  There's a picture of Joe

19    Tommasi on the defendant's Facebook page.

20         Let's go to 5696, please.

21         There he is.  Okay.  So the Email reads, this is

22    Joe Tommasi, Charles Manson.  Where do we see Charles

23    Manson?  All over the defendant's Facebook page.

24         If we could go to 7294, please.

25         And I won't go through all of this, but here you

```
 1    saw this before.  He goes on this long diatribe about who

 2    Charles Manson is, what he was doing.

 3              If we could go to 7288.

 4              It talks about getting this Charles Manson disk at

 5    Walmart for $5.

 6              Let's go back to 8384, please.

 7              Now, where I talked about -- the victims are the

 8    people he mentioned on Facebook.  You have arrested

 9    14 righteous brothers and sisters with the American Front,

10    which is all over Facebook.

11              If we can come back out, please.

12              If you do not comply with this order, we're going

13    to grab your grandkids, Lawson Lamar, and we're going to

14    "F" them with knives.

15              And we've already covered that.  Where do we get

16    that imagery from?  From the downlink on the webpage as

17    well as the MP3 player.

18              Then we're going to cut their heads off and leave

19    them in a cooler outside your office.  And then with a

20    bucket of blood, we will paint pig on your walls.

21              If we could go to 5702.

22              Where have we seen this imagery from?  Defendant's

23    Facebook page.  Downloaded on April 13.  And as the agent

24    testified, this is the Manson -- this is the scene of a

25    Manson murder, where one of the victim's blood was smeared
```

1    on the door and formed the word pig, which you can kind of

2    make out in the picture here.

3              THE COURT:  Mr. Chiu, you have 15 minutes left of

4    your total time.

5              MR. CHIU:  Thank you, Your Honor.

6              Let's come back to 8408, please.

7              Judge Turk, you saw this Email.  The only thing I

8    want to point out is this line at the bottom.  Political

9    terror is the only thing they understand.

10             Where did we see that?  We saw it on the

11   defendant's Facebook page with the gun and the text under

12   there.

13             Now, the Court is going to go over with you the

14   elements of the offense, and we can cover that.  But

15   suffice to say, I'll cover that real quick.

16             The defendant -- counts one through five are the

17   same elements.  The defendant knowingly sent a message in

18   interstate or foreign commerce containing a true threat to

19   kidnap any person or injure the person of another.  The

20   defendant did so with the attempt to extort money or

21   something else of value, such as dismissing the case

22   against the American Front.

23             The last count, the defendant knowingly

24   transferred, possessed, or used, without lawful authority,

25   the means of identification of another person.  And the

 1   defendant did so with the intent to commit or in connection

 2   with any unlawful activity that constitutes a violation of

 3   federal or state law, and the transfer, possession, or use

 4   of the means of identification was in interstate or foreign

 5   commerce.

 6          And means of identification includes any name or

 7   number that may be used, such as a name and an address,

 8   alone or in conjunction with any other information, to

 9   identify specific individuals.

10          Now, you've seen all the evidence, and I've tried

11   to go over it the best I can.  There's lots more.  We could

12   be here all day.  You see where it leads.  We all can see

13   where all the arrows point.

14          The defendant is guilty.  We ask that you find him

15   so, and hold him accountable for what he's done.  Thank

16   you.

17          THE COURT:  Okay.  Ladies and gentlemen, we're

18   going to take a short break.  You're really going to

19   control the length of the break to a certain extent.  I

20   would like to say five minutes, but I don't know that

21   that's realistic.

22          I want you to be refreshed and comfortable when

23   you come back.  So you knock on the door as soon as you're

24   ready and let the security officer know.  As soon as you're

25   ready, we'll resume.

1        Thank you.

2            (Recess at 9:57 a.m. to 10:10 a.m.)

3        THE COURT:  Please bring in the jury.

4        Mr. Henderson, do you want me to let you know when

5    a certain amount of time has passed?

6        MR. HENDERSON:  No, Your Honor.  I'll keep track.

7    I probably won't take the full hour.  I may.

8        THE COURT:  I should have asked you, Mr. Chiu, but

9    I didn't.  I wanted to make sure you knew where you were.

10       MR. CHIU:  Thank you.

11           (Jury entered the courtroom at 10:11 a.m.)

12       THE COURT:  Mr. Henderson, you may proceed.

13       MR. HENDERSON:  Thank you.

14                **CLOSING ARGUMENT BY THE DEFENSE**

15       MR. HENDERSON:  May it please the Court.

16       THE COURT:  Yes, sir.

17       MR. HENDERSON:  Counsel.

18       Ladies and gentlemen of the jury, we should be

19   careful how we act, lest we become the evil that we

20   deplore.

21       When I first heard that, I was too young to

22   appreciate its meaning.  As you grow older, you tend to

23   realize the significance of those words.  And I suggest

24   that there are influences in life that as you grow older

25   you develop more knowledge, more wisdom, more insight, more

```
 1    experience, and your views change, your attitudes change,
 2    and you become aware of what peer pressure does.
 3            Peer pressure, especially when you're young, is
 4    very strong.  It's very influential.  As an example, people
 5    may choose to hunt when they're young.  They may be among
 6    family members or friends or people that go out and they go
 7    hunting.  They get caught up in the thrill of shooting
 8    things and capturing things, bows and arrows and whatever.
 9    And they don't stop to think, what is it that I'm doing
10    here?  Really, what is it that I'm doing.
11            And as they grow older, they become aware of
12    different things, and they think I've done things I'm not
13    proud of.  But you can't change that as a result of peer
14    pressure.  It may make you do something later in life you
15    may regret.  But be sensitive to peer pressure.  Stick to
16    your own values, the ones that you have today.
17            This is a criminal matter.  This is a case where
18    the United States Government has accused a fellow citizen
19    of committing crimes.
20            You're in a very privileged position right now.
21    You can't ask to be a juror.  You can't say I volunteer.  I
22    volunteer.  It's a selection process.  You're here because
23    you promised to set aside the biases and the beliefs and
24    the things that contaminate a truly fair objective
25    determination of what the facts are as applied to the law.
```

1          Now, there will be no question about what the law

2     is.  The law comes in the form of instructions that are

3     provided to you by the Court, no dispute about that.

4     You're here to determine what the facts are, what has been

5     proved.  What has been proved beyond a reasonable doubt,

6     applying one of the fundamental principles that we have in

7     America, and that's the presumption of innocence.

8          A defendant does not have to prove anything.  The

9     burden is on the United States of America here to prove

10    beyond any reasonable doubt that Mr. White, this man

11    sitting right here, is the person -- you heard the

12    testimony -- sitting behind the keyboard making these

13    communications, making these threats.

14          And the reference was to the evidence.  Well, the

15    evidence that they've gone through is not all the evidence.

16    All the evidence is sitting right there on that table.  And

17    all the evidence was presented in the courtroom, the

18    testimony that you've heard.

19          Your impressions about the credibility of

20    witnesses.  Were they hiding something?  Were they being

21    less forthcoming with some of their answers than with

22    others?  That's your determination.  Each and every person

23    of the jury has that responsibility to listen and make your

24    own determinations about who's telling the truth and who's

25    not.

1          You've heard evidence that Mr. White has a

2     criminal record.  He was on federal supervision.  He had

3     enough with the United States Government and he was on his

4     way.  And he was on his way to Mexico.

5          I apologize, because I don't speak loudly enough.

6     And hopefully what I have to say is a little bit important.

7          A person that is on the run, that is trying to get

8     away from America, is going to take steps to try to not get

9     caught.  He's going to use something called TOR, an

10    anonymizer, where they can't track his IP.  He's going to

11    be careful.  He's going to be telling people to delete

12    stuff so we aren't tracked, we aren't followed.  That's

13    kind of common sense.

14         In the overall scheme of things, that really has

15    nothing to do with the implications that are being put on

16    it here.

17         The encryption of Mr. White's computer.  If you

18    stop and think about that, Mr. White at one point was the

19    head of a very unpopular Neo-Nazi organization.  You can't

20    get around it.  That's what he was.  It's now defunct.

21    It's gone.  But there's probably information that is in his

22    head and in that computer that would be important to the

23    United States Government as far as getting in there and to

24    other people.

25         Anybody that could get into that computer would

```
 1   have information that would endanger not only Mr. White,
 2   but a lot of people.  The fact that a computer is
 3   encrypted, I suggest, bears no indicia, no indication
 4   whatsoever that a person is guilty of a crime.  I submit
 5   that in today's day and times, if you do not have your
 6   electronic devices encrypted in some form, protected with a
 7   very secure password, then you're playing with fire as far
 8   as the communications.
 9          The accounts that are out there, the Email
10   accounts, the Facebook accounts, you think you're secure.
11   You hit delete and it's gone.  This can never be used
12   against me.  Or this can never be read again.  And it was
13   just in jest or it was a freak conversation or I was drunk
14   or whatever you were saying at the time doesn't disappear
15   ever.  It's there.  And it can be taken back.
16          And it can be arranged in a scenario, extracted
17   from other communications that are there.  It may not even
18   be yours.  There may be other communications that are on
19   that account that are being used by other people.  But it's
20   attributed to you, because that's your account.
21          And does the Government have to show that the
22   person sitting behind the keyboard is the one that's
23   writing each and every communication?  I suggest that's
24   part of their burden of proof.
25          There are ways to do things.  They have these
```

1   envelopes that are here.  They were sealed in evidence.

2   They had to be opened on the stand to show how important it

3   is to maintain a chain of custody of evidence so that it

4   can be only identified as the object that they're speaking

5   about, whether it's a computer, an MP3 player, or whether

6   it's those envelopes that were mailed.

7        They can be forensically tested so that the

8   inscriptions that are there, the messages that are there.

9        You have Sabrina Gnos saying I know Mr. White's

10  handwriting.  He signed my checks.

11        Is that his handwriting?  Well, is it?  Would you

12  like to have an expert that does handwriting comparisons?

13        I've got an autographed baseball.  I have Babe

14  Ruth's signature.  When you spend the money to buy that

15  baseball, you say, no, I want some kind of proof that that

16  ball I'm really buying is really autographed by Babe Ruth.

17        Would you buy a baseball from Miss Gnos saying I

18  know Babe Ruth's signature, and that's his.  I know it for

19  sure.

20        There's other forensic evidence that can be used

21  on items like that.  They've got DNA.  They've got

22  fingerprints.  You've heard none of that.  You've got the

23  word of Miss Gnos that those are Mr. White's inscriptions.

24        Now, did you notice the difficulty she had in

25  reading that message to Mr. Bondurant?  Oh, the letters are

 1     running together.  It's not that hard to read.  And

 2     especially the part about the queer daughter.  And where

 3     did that come from?

 4          She knows Mr. Bondurant.  Her father knows

 5     Mr. Bondurant.  She described him as an evil -- her father

 6     as an evil person.  Her father as the one who had gone into

 7     her Facebook and assumed her identity and posted things

 8     that she had to clear up later.

 9          What do we know about her father and his

10     relationship with Mr. Bondurant and the officials in

11     Virginia?

12          They point to the fact that when Mr. White was

13     being prosecuted in Virginia.  The date showed the

14     information there was 2011.  And that's when he did

15     research on the people that were prosecuting him.  And I

16     suggest that's not incriminating.

17          If you're a smart person and you've got the

18     Internet and someone is coming after you, you see what's

19     out there.  You look them up.  And there are Wikipedia

20     articles on some of these people.

21          Is that so incriminating that it points to

22     Mr. White as the one sending those packages?  I suggest

23     not.

24          Let's talk about Miss Gnos for a second.  This is

25     the young lady who came to court with a skull on her

1    sweater, would seemingly be inappropriate.

2         You can assess her credibility through her

3    demeanor.  Is she such -- I'll use the word airhead.  Is

4    she that much of an airhead, is she that noncaring, that

5    ignorant, that I don't care?  Or is she instead pretty

6    shrewd?  She's been on her own since she's 13.  She knows

7    the way things are.  And she knows that she can get by

8    being dumb.

9         And the more she doesn't remember and the more

10   that she just says, oh, I don't look at those things, I

11   didn't read that.  I don't remember.  I don't recall.

12        That's the easy response, because in the responses

13   that she was nailed down and gave at other times, she had

14   forgotten.  And when she was reminded of them, it indicates

15   her credibility.

16        But think about this:  Miss Gnos knows about those

17   packages that were sent to Mr. Heaphy, Mr. Bondurant, and

18   Judge Turk.  She knew about it.

19        And when she came back from the trip with

20   Mr. White -- he trusted her.  Let's go to Mexico.  You can

21   have the car.  She came back and she's the one that says

22   those envelopes, those packages were in that car.  That's

23   her testimony.  She said, well, there are other envelopes.

24   There's other correspondence.

25        How is it that only those packages get mailed that

```
 1   have those threats to those individuals, and the mail to
 2   Mr. White's wife and the mail to his mother, apparently an
 3   empty envelope that contained nothing, it was simply a
 4   letter, does not get mailed?  How is it it does not get
 5   provided to the marshals or the F.B.I. when they say, well,
 6   give us what you've got?
 7           And it's only later, well, the marshals, I guess
 8   at first, just weren't interested in obtaining that, but at
 9   some point, they did.  And when they received it, empty
10   envelopes.  Well, what was in those envelopes?  Was it
11   names?  Was it passwords?
12           Miss Gnos indicated that she uses the computer of
13   her roommate, Shannon.  She uses her father's computer.
14   Other persons' computers.  Her father is using her Facebook
15   account on that computer.  How easy is it if you have the
16   password and if you have the username to simply go on
17   someone's Facebook, assume the identity?  Go on to
18   someone's Email account, assume the identity.
19           You heard Kelly Boaz.  In the old days, this is
20   back in 1990, he was in a room when a phone rang.  He
21   picked it up and he pretended to be the occupant of that
22   room.  The people came in to sell drugs and they were
23   caught.
24           Anyone can assume anybody else's identity.  And I
25   suggest that there's been testimony showing that.  That
```

1    it's fairly easy to do.  And with the experts of -- with

2    the technology today and the expertise of people certainly

3    in criminal organizations, maybe it doesn't require that

4    much.

5           You can find a password written.  You can watch

6    somebody type their passwords in.  It could be in someone's

7    wallet.  It could be anywhere.

8           But there are also these key capture programs that

9    people use that you're on a computer and they fool you into

10   entering your data and, boom, they've got it.  And once

11   it's out there, as Mr. Lamar said, once it's out there,

12   it's out there.  It's on the Internet.

13          And you have celebrities right now who thought

14   they were as secure as they could be, with ultimately

15   private stuff they do not want out there, and it's on the

16   Internet and everybody is looking at it.  Everybody is

17   using it.  That's a problem.  And it ought not to be like

18   that.

19          Now, there's no defending the communications that

20   were sent.  Absolutely none whatsoever.  Whoever did that

21   needs to be caught, needs to be prosecuted.  And I can't

22   say otherwise.

23          I can say that this is the Government's evidence

24   against Mr. White, and it's wholly inadequate to show that

25   Mr. White and only Mr. White in the entire world, everybody

1   with Internet access is the one that was doing this.

2          Now, some of the evidence that was presented, a

3   lot of it was redacted in the first instance.  And then

4   when it came in in the second instance, there were

5   conversations that were there, private conversations that

6   were deleted.

7          But who is it that's using the accounts?  Their

8   usernames?  They are simply some person somewhere that's

9   typing in a communication that creates a conversation

10   between two people.  And it goes off.  And they talk.  And

11   how does that establish identity?

12          If you look carefully at the conversation with Amy

13   Back, you have, well, aren't you Jane?  Didn't I know you?

14   Are you still using the Email account from way back before?

15   It's more getting information than it is just friends

16   talking.

17          Photographs.  How easy is it to get photographs?

18   You can download them if they're on the Internet.  You can

19   go to someone's house and you can take them and you can use

20   them.  And you can create accounts using someone else's

21   photographs.

22          And if that's the only evidence you have of this

23   is the person that created this account because there's

24   photographs in there of this person, that's pretty tenuous,

25   I suggest.

1          The clips that are taken are just segments,

2    snapshots as we're going through time, from the time that

3    Mr. White went to Mexico to the time he was apprehended on

4    June 8.  Look at this, look at this.

5          And if you recall the movie "My Cousin Vinny,"

6    there were a couple of scenes in there when he was being

7    interrogated by law enforcement.

8          And he was asked, at what time did you shoot the

9    clerk?

10         And he said, shoot the clerk?  I shot the clerk?

11   I shot the clerk?  What are you talking about?

12         And when law enforcement testified, they reported

13   accurately, truthfully, that young man said, I shot the

14   clerk.  I shot the clerk.

15         But it's context.  It's putting the emphasis

16   correctly on the conversation that was occurring and being

17   able to tell how was this used.

18         In the overall scheme of things, everything that

19   occurred before and contemporaneous with it, that's how you

20   use communications.  You don't take snapshots and say look

21   at the story I can create.

22         I'm not going to go through all of the exhibits.

23   I think that they're interesting.  I think that if you do

24   that you will see that there's an attempt here to point the

25   finger directly at Mr. White.

1          Those communications refer to Mr. White as the

2     righteous William White.  Righteous Brother William White.

3     Anybody can write that.  That raises the specter, the white

4     supremacy.  That's in those initial conversations that are

5     there.

6          So at least this -- the investigation is being

7     focused on Mr. White.  Whoever is doing this is providing

8     the information though law enforcement.  Look at this.

9     This is Mr. White.

10         And if you compare the materials that are there,

11    you have the book that Mr. White wrote, that he authored.

12    That's his writing style.  That's what he believes.

13         And you don't have to agree with it.  No one has

14    to agree with what anyone else in the world writes.

15    They've got the right to put it out there, let people read

16    it, believe it, don't believe it.  It generates discussion

17    is what it does.

18         No one goes right down the middle of the road.

19    People get on either side.  And some people get way on the

20    other side.  But you let them go because the content of

21    their message is such that it's, oh, I don't believe it.  I

22    just don't accept that.  If you feel that way, you feel

23    that way.  That's you.  That's you.

24         We're not talking threats here.  We're not talking

25    about the ugly language that's going out there as far as

 1   the threats.  What we're talking about is a published book.

 2   This is who I am.  These are my beliefs.

 3          Read about Charles Manson.  There's a chapter

 4   there about Charles Manson.  And you get to see Mr. White's

 5   disdain of Charles Manson.  Who is this guy?  He's a nut.

 6   He's a cult leader.  That's who he is.

 7          The other reference --

 8          May I approach, Your Honor?

 9          THE COURT:  Yes, sir.

10          MR. HENDERSON:  Government's Exhibit 50.  There

11   was the threat.  This one at the bottom.  May 20 is when

12   this comes out.  This was a repost.  It came from the

13   helter skelter account to the dhyphen@yahoo.com account.

14   What's that all about?

15          It's a clear indication, one that

16   dhyphen@yahoo.com account is involved.  It's like go look

17   here.  Go look at this dhyphen@yahoo.com account.  Whoever

18   is getting this is going to follow the trail.  You're going

19   to go directly to that dhyphen@yahoo.com account.  So law

20   enforcement is getting focused on dhyphen@yahoo.com.

21          This is the repost of the Email threat that was

22   seized from the dhyphen@yahoo.com account.  And the link.

23   I asked Mr. -- there was this link here to this book,

24   "Siege."

25          Did you happen to look at the book "Siege," click

```
 1    that link?

 2              Oh, no.  I didn't click that.  No, sir.

 3              But if he had clicked that, he would have gone to

 4    the book that you saw the clip about.  And you see what it

 5    said.  And it's this book, "Siege," by James Mason.  And

 6    you go through these bad words.  They are on here.  And the

 7    articles that are on there.

 8              And you'll see that writing style of the National

 9    Liberation Socialist Front, the NLSF.  That's pure NLSF and

10    those messages are pure NLSF.  They're entirely consistent.

11    Same phrasing, same use of the pigs references, same digs.

12    All of that is within this book.  It's online.  Anybody can

13    get in.  It's online.

14              These different categories that are here, you

15    click on.  And each has an article with it, 400-something

16    pages.  It's out there.  This person's idea -- but it is

17    radical.  It is this pig stuff.

18              And there's stuff on here called "Night of the

19    Buck Knives."  That's not just lyrics.  That's a chapter

20    out of this fellow's book, or at least an article that was

21    there.

22              One on Charles Manson.  Chapter -- and you'll see,

23    Charles Manson is repeatedly, throughout all of these

24    works, about how he's the one with the insight on how to

25    run America.
```

1          Of course, references to Mr. Tommasi.  Tommasi was

2     mentioned in those references, in the threats.  Joe

3     Tommasi.

4          And you would see the -- we are NLSF.  Our reasons

5     for being NLSF.  And they've got this gun that's right

6     there.  Political terror is the only thing they understand.

7     And the Government makes the connection.

8          That's on Mr. White's Facebook page.  It's right

9     there on his Facebook page.  And it is.  Government's

10     Exhibit 5 shows that.  Yes, sir.  It's right there on

11     Mr. White's Facebook page.

12          And if you look at it, where's the gun pointed?

13     Right at Mr. White.  Now, is that a joke?  Is that somebody

14     being funny?  This is an organization that's out there

15     saying, well, Mr. White isn't doing well in our view as far

16     as being a leader of a white supremacy movement with his

17     views because he's not radical enough.  So we'll just

18     eliminate Mr. White.

19          The Government must show that Mr. White and only

20     Mr. White was the person that sent those threats.  And if a

21     reason exists to believe that someone other than Mr. White

22     could have done this, then that's the question.

23          The Government is talking about song lyrics.  Song

24     lyrics were in the messages, were in the threats from

25     Hellfire and some of the other groups, Cannibal Corpses.

 1          We recall Miss Gnos.  Miss Gnos said she's a

 2     karaoke singer and deejay, disc jockey.  And she has the

 3     lyrics to thousands of songs.  And what songs does she

 4     listen to?

 5          Defendant's Exhibit 4.  She sent an Email with

 6     this song.  The attachment at the top from Murderdolls,

 7     "Evil is Good."  I suggest that's not a song that would get

 8     played at a wedding.  You did not get to hear the song, but

 9     the title and the singers tell you a lot about the music

10     taste of Miss Gnos.

11          What's interesting, when she was asked about her

12     phone that she had during this period of time, and she

13     described her phone, she knew the make, the model.  Called

14     it a retarded phone.  It wasn't a smartphone.  Only had

15     limited Internet access.

16          But she let it slip that when she went to Mexico,

17     she had two phones.  Oh, two phones.  She had the business

18     phone that she was provided by Mr. White with the

19     information that was on that.  So she not only took a GPS

20     with her, she took two phones.

21          And her contention that, well, she didn't know

22     that Mr. White was fleeing the United States and that he

23     was on supervised release and had permission, that just

24     doesn't stand up when they're going through Mexico, not

25     showing any papers at all.  That's just not believable.

```
 1            Her friends, her associates, Mr. Blake -- Blake

 2   Owens Harris.  He wouldn't care that she spent a week with

 3   Mr. White.  Her testimony, it wouldn't bother him at all.

 4   He was promiscuous.  So I guess they do their own things.

 5   He wouldn't be upset with her whatsoever.

 6            But she was calling him and she would have

 7   confided in Mr. Blake.  Blake Harris Owens.  She confided

 8   with Shannon.  She confided with her father about the trip.

 9            And once that information is out there, it's out

10   there.  It can be used by anyone at any time for any

11   purpose.  Anyone with an agenda.

12            Now, this American Front group is in the Orlando

13   area, the Central Florida area.  I believe you've heard

14   testimony from the lady from the Southern Poverty Law

15   Center, Heidi Beirich, that this group is a violent group,

16   as are a lot of these groups, violent groups.

17            Their leadership has been murdered in the past by

18   other individuals of their own or similar groups.  That's a

19   lot of in-fighting that goes on among these groups.  And

20   that's how they get membership.  Because other leaders go

21   away, and the views change.  And their membership grows and

22   swells, depending on the conformity of their ideas at the

23   time.

24            Because it's not one size fits all.  It's not

25   everybody hates blacks, everybody hates Hispanics,
```

 1    everybody hates the Jews.  It's not like that.  It's like,

 2    well, we can accept this, but we don't like that.  But the

 3    tension makes these group members move around.

 4           And the skinheads, I suggest, are a definite

 5    identity.  They are an identifying group.  And the

 6    skinheads have their views.  And they have their

 7    disagreements with other white -- and I call them

 8    separatist groups, that just believe that the races should

 9    be separate.  These people should be separate.

10           We know that this helter skelter account was

11    created at one point, used, messages were sent, and then

12    there was material left in there pointed at Mr. Donelson.

13    It was never sent.  And there's no explanation for if it

14    was Mr. White, who wasn't arrested until June 8.  And this

15    threat was created back in March.

16           Well, if Mr. White is the one sending these

17    threats to these people that he knew, push the button and

18    send that, there's no explanation for that.

19           Was the person who was in charge of the helter

20    skelter account apprehended, sick, just not using it?  Was

21    it a group of people?  One people doing one thing and the

22    other person doing the other?  We just don't know.

23           We know that the helter skelter account was

24    created.  And it's interesting that when you do a subpoena,

25    there are fields that you can ask for.  And you can say, I

 1    want this user information on the account.  You get the

 2    fields as to the name of the person or the identities that

 3    set it up, and the date and the IP that was used.  You get

 4    that.

 5            And then you can do another subpoena and ask for

 6    the gender, date of birth, or the people that set it up,

 7    and it can indicate that it was a woman that set this up in

 8    Roanoke.  You get different documentation depending on what

 9    you ask for.

10            The music on the MP3 player, it has lyrics from

11    all over on it.  Songs.  It has the actual songs that are

12    there, from Johnny Cash to toddler tunes, to music that was

13    there that also suited Sabrina's taste.

14            They had a vehicle that you could play songs

15    through the radio using the MP3 player.  They're going to

16    be on a long trip together, for days.  How incriminating is

17    that?  I can go on.

18            I think what's most significant at this juncture,

19    the Government created a timeline.  They took clips of a

20    conversation that was online, that was there by whoever

21    typed it -- whomever typed it.  But they have not shown

22    that Mr. White is the person, and more importantly, the

23    only person that can have done that.

24            Anyone with Internet access, access to those

25    accounts could have done that.  They could have been

```
 1    sending the messages to themselves.  They could have

 2    created another account with the name Amy Back and written

 3    messages to themselves and responded to themselves.

 4         You have messages being posted.  What are the

 5    names of the people involved in Florida?  And then

 6    immediately under that, well, these are the names.  No one

 7    responds to that.  The names are provided by the person

 8    that's writing the account and asking for the information.

 9         What's the purpose of that at all?  Why put that

10    out there?  Makes no sense.

11         The reference to CAT.  Apparently there's some

12    other form of communication that people can use.  It's

13    private.  It's encrypted.

14         MR. CHIU:  Objection, Your Honor.  That's not in

15    evidence.

16         THE COURT:  Do you wish to be heard?

17         MR. HENDERSON:  I'll rephrase.

18         There's a reference to CAT, C-A-T.  And it was in

19    the context of communications.

20         And my recollection -- and rely on your own

21    recollection.  Or look at the exhibit, because that's

22    really what's important.  And I don't have that right at

23    hand right at the moment.

24         Bring up, just pull up -- is it 467?  Bates stamp

25    00467.
```

1          Might say, where do I get some encrypted chat

2     other than CAT?

3          Now, my take on that would be that you're talking

4     about other encrypted communication devices, but that may

5     not be a fair construction of that.  So rely on your own

6     interpretation about whether there is a program called CAT

7     that someone could use to correspond with someone that

8     apparently the United States does not have.

9          The Kindle can be used for communicating online.

10    There's no information on the Kindle.  That was damaged at

11    some point.

12          Now, is the inference there that Mr. White damaged

13    that while he was being arrested by the Mexican

14    authorities?  It would be really nice to have some

15    documentation out of Mexico that sets the time and the date

16    and the circumstances, and what happened when Mr. White was

17    arrested.  But no.  Documentation doesn't exist.  It exists

18    from Miami up here.  It doesn't exist for what happened in

19    Mexico.

20          When you were selected as jurors, you all took an

21    oath.  You raised your hand and you said, I'm going to

22    follow the law.  I'm going to apply my judgment as to what

23    I find the facts to be as far as credibility, and I will

24    render my decision.  Each and every one of you did that.

25    So it's not as a group, we, the jury.  No, it's I as a

1    juror.  It's an independent contribution here.

2              Every juror's opinion, every juror's finding is as

3    heavy, is as important, is as weighty as any other juror's.

4    You're all in the same position.  You're all there

5    obligated to truthfully follow the law, objectively follow

6    the law, assess the credibility of the witnesses, weigh the

7    Government's evidence, and see if there's a reasonable

8    doubt.  That's why we're here.

9              That's kind of the American way.  That's the

10   unique aspect of American justice.  And in a case like

11   this, it's incredibly important to apply those principles

12   that make America what it is.  That America can provide a

13   fair and just trial to someone with Mr. White's background

14   and say, no, Government.  You didn't carry the day.

15             Now, this is an anonymous jury, which means your

16   names aren't known.  We don't know who you are.  The Court

17   staff knows who you are.  You may know each other at some

18   point.  You may have introduced yourself, but that's among

19   you.  You don't have to tell anyone at any time how you

20   voted, why you voted.  It's your conscience.

21             But you can't change your vote ten years from now,

22   twenty years from now.  You're looking back and saying I

23   wonder.  I wonder if I made the right decision.  Hmm.  Or

24   there's this possibility or that possibility.  You can't

25   change your vote once it's that far away.

```
1              So you need to be very sure when you vote today

2    that you apply the presumption of innocence, that you

3    follow the Court's instructions fully, carefully,

4    objectively, assess the credibility of the witnesses.

5              I suggest if you follow the law, if you see the

6    facts and the evidence the way they can reasonably be

7    construed, then the state has not -- excuse me -- the

8    Government has not met its burden in this case as to any of

9    the charges, the extortion.

10             There's nothing for extortion.  No reasonable

11   person is going to threaten a law enforcement officer.  You

12   saw Mr. Lawson Lamar's actions.  You're fanning the flames

13   when you threaten an official.  They are not going to

14   release anybody.  They are going to come after you with the

15   guns blazing.  And that's what happened.

16             And whose name did they have that was provided

17   right there in that threat?  Righteous Brother William

18   White.  And I suggest there's more than a reasonable doubt

19   in this case that Mr. White is the one that sent those

20   communications.

21             I'm through, Your Honor.

22             THE COURT:  Okay.  We're going to continue on,

23   then.  Mr. Chiu?

24             MR. CHIU:  Your Honor, how long do I have?

25             THE COURT:  I think 14 minutes.
```

 1          MR. CHIU:  Thank you.

 2                **CLOSING ARGUMENT BY THE GOVERNMENT**

 3          MR. CHIU:  We'll boil it down basically to three

 4    things.

 5          There's no proof it wasn't me.

 6          Well, everything is taken out of context, is the

 7    second sort of prong.

 8          And, third, well, even if there is proof, someone

 9    else set me up.  I was framed.

10          So let's start with the first one.  There's no

11    proof.  We talked about -- the defense talked about

12    possibilities.  There's all of these possibilities that

13    we're leaving out there.

14          And the Court will instruct you, you know, it's

15    proof beyond a reasonable doubt, that it's not proof beyond

16    all possible doubt, but it's doubt based upon reason and

17    common sense.

18          So I like to use the analogy here.  And, well,

19    there's kind of two points to this.  Blueberry pie.  You

20    walk into a kitchen and little Johnny, Timmy, Tommy,

21    whoever, is in the kitchen and the blueberry pie is gone.

22          Now, the defense has sort of inferred there's no

23    direct evidence pointing the finger that -- no one is

24    saying that William White was sitting behind the computer

25    on this day.  They are drawing a distinction between direct

1     evidence and circumstantial evidence.  You'll hear from the

2     Court in the instructions that there is no legal

3     distinction between the two.

4          Go back to the blueberry pie.  Direct evidence is

5     you walk into the kitchen and your husband or wife or

6     whoever says Johnny ate the blueberry pie.  Direct

7     evidence.  That's like someone coming to court and saying I

8     saw Bill White behind the keyboard of this computer doing

9     these threats.

10         Circumstantial evidence, you walk in the kitchen,

11    little Johnny is there.  The blueberry pie is gone.  The

12    pan is at his feet.  He's got pie on his face.  He's got

13    pie on his hands.  He's got crumbs in his mouth.  That's

14    circumstantial evidence that little Johnny ate the

15    blueberry pie.

16         Let's use the same analogy for reasonable and

17    possible doubt.  You know, is it possible that someone else

18    came into the kitchen and entered and left without a trace

19    and took the blueberry pie and smeared it all over little

20    Johnny?  That's possible.  Is it reasonable to believe

21    that?  No.

22         So as far as the proof against the defendant, we

23    would submit that the evidence is overwhelming.  It's the

24    defendant's Facebook page.  Defendant's -- and you can --

25    you know, you can look at the records yourself.  It's got

1    defendant's pictures.  It's got postings about the

2    defendant's books.  It directs people to the

3    dhyphen@yahoo.com Email address, which is the defendant's

4    Email address.  It talks about all kinds of mundane and odd

5    things that it goes on and on about.

6             So in terms of the issue, oh, well, these are

7    taken out of context.  All of these little things are taken

8    out of context.

9             Well, there's a reason a lot of what was up there

10   was redacted or not shown to you, and largely that is that

11   none of us probably want to sit through Agent Majeski

12   testifying for, I don't know, a week, about every line

13   that's in those Facebook records.

14            So instead, you look at context.  Government's

15   Exhibits 71, 72, 73, 74, and 75 are big chunks of the

16   Facebook records from the defendant.  So you can double

17   check, make sure that we're not hiding anything.

18            But as far as you know, this whole thing of, oh,

19   well, maybe somebody else did this as a prank, you know, on

20   Facebook.  And if someone gets pranked on Facebook, someone

21   gets on your Email account because you didn't log out, or

22   your brother, your sister, your family member gets on and

23   starts doing some crazy stuff or starts doing some crazy

24   stuff and says funny things or embarrassing things about

25   you, what does a person do?

 1            When they log back on they will say, hey,

 2     so-and-so, you got me.  Everybody, that was my brother.

 3     That was my sister.  They're so funny.  And you know, you

 4     change everything back and you move on.

 5            That's not what happened here.  You can look

 6     through the records yourself.

 7            Agent Majeski asked him, you know, was there

 8     anything like that?  Was there anything like, hey, someone

 9     was using my Facebook page and posted this crazy stuff?

10     You know, that's not me.  There's none of that.

11            What you did see, and the timeline was a week

12     later, two weeks later, he's still posting about this.

13     He's still posting about that threat from the 20th.

14     He's still posting about the American Front.

15            So the other sort of defense sort of thing is

16     someone set me up.  Someone set me up.  Well, if that was

17     the case -- first of all, let's live in this world -- I'll

18     live in this world for a second, and we won't even get into

19     the why would someone do that.

20            But under that premise, okay, somebody created a

21     Facebook account for the defendant back in December, you

22     did all kinds of activity on this Facebook account back in

23     December, all the way up till June, posted all kinds of

24     stuff.  And, I mean, you're just going to have April and

25     May, maybe a bit of March.  But you can get a feel for it.

1            There is a lot of stuff in there.  There is a lot

2       of messages, conversations, not about NLSF but just about

3       stuff.

4            So whoever -- first of all, whoever is setting the

5       defendant up is doing it essentially as a full-time job.

6       And if someone wanted to set the defendant up and they had

7       this control of the Facebook page that looks exactly like

8       him and had pictures of him growing up, why would they make

9       it so hard?

10           If someone wanted to set the defendant up, why

11      would they make it so that we would have to sit here for a

12      whole week combing through little bits and pieces off of

13      his Facebook page?  Why not just make the threat from

14      Facebook?

15           Why not just do this Email and register it as Bill

16      White, Roanoke, Virginia?  Even in those Emails why not

17      say, hey, this is Bill White.  I'm coming for you.  You

18      guys don't know where I am.  I'm missing.  And where I am

19      is right outside your house.

20           That's what you would do if you were trying to set

21      somebody up.  If you were trying to set somebody up, you

22      wouldn't go this roundabout way and take over their

23      Facebook.  And not to mention if you look at the Facebook

24      records while that's happening, while all of these posts

25      are happening, that Facebook account is blowing up with

```
1   messages to and from people, with Facebook statuses,

2   updates, again, over some stuff having to do with the case

3   and over a lot of stuff that's just mundane stuff about

4   editing books, which is what the defendant does.  Mundane

5   details about Mexico.

6          Now, we also talked about Sabrina Gnos.  I didn't

7   have a chance to do this in the first close.  But, frankly,

8   first of all, she's not even really a terribly big part of

9   this case.  She's here to testify to connect some of the

10  dots.

11         But you saw her.  Sabrina Gnos is what she looks

12  like.  And what she comes off as, you know, she's an

13  uneducated girl, you know, who was used by the defendant to

14  his ends.

15         The whole thing of, oh, the songs, well, she was

16  in the car with the songs and the songs would suit her

17  taste as well, well, you have the printouts from the

18  forensic analysis.  You can take a look at when the songs

19  are downloaded.  "Helter Skelter" was downloaded April 17,

20  2012.

21         Just like you'll see -- you saw on the Facebook

22  page.  Now, how the person setting him up on the Facebook

23  page would know that, I don't know, because it's not real.

24  And then the other ones, Cannibal Corpse and Electric

25  Hellfire, that was back in 2011.
```

```
 1              Now, if you take Sabrina Gnos' testimony, you go,
 2   does it match up to everything else I saw?  You saw an
 3   Email from her to the defendant giving him a list of mail
 4   that she picked up from her P.O. box, which clearly he has
 5   Internet.  Because why would she be Emailing him stuff like
 6   that when he's in Mexico?  You heard the tape of him
 7   saying, I'm in Mexico, and I got Internet.
 8              You also saw the Emails from the Yahoo account
 9   from 2011 with the same people who are getting packages.
10              So Sabrina Gnos' testimony squares right up with
11   all the evidence that you see.
12              Now, you're going to be presented with jury
13   instructions -- if I may have the ELMO -- and you're going
14   to have this verdict form.  And you just go through and
15   check.  And when you go through the evidence, you're going
16   to find the defendant is guilty on each of these counts.
17              And it says here, if you answer guilty on these
18   counts -- you don't have to worry about answering this.  If
19   it's not guilty on the first counts, based on the
20   extortion, which clearly these Emails are attempting to
21   extort action out of the officials, then you would decide,
22   you know, guilty or not guilty on this.
23              And on count six, look, this is an identity case.
24   This comes down to who did it?  And the defendant did it.
25   And we already went through the elements.
```

1        If he did one through five, you know, the elements

2   are going to be met for six, really.  I mean, you can take

3   the instructions as they are.  But you have names and you

4   have addresses used together to identify a person.

5        So the conclusion is unavoidable.  You look

6   through the evidence; it only leads you to one place, to

7   the defendant.  And it's up to you to hold him responsible

8   for this terrible act.

9        Thank you.

10       THE COURT:  Okay.  Ladies and gentlemen, that

11  concludes final argument.  All that remains for you here to

12  do in the courtroom is listen to my instructions.

13       I'm going to give you another break.  And during

14  this break, I want it to be as short as can be while

15  consistent with your comfort and your ordering lunch.

16       I'm going to put menus back there so you can tell

17  me what you want to eat, and I'll make arrangements to get

18  it here.  It probably won't be as fast arriving as you

19  would like, but we'll put the order in the process anyway.

20       When I do give you your instructions, you will

21  each have a copy, a written copy of them, so you may or may

22  not want to take notes.  I'll leave that up to you.

23       Thank you.

24       (Jury exited the courtroom at 11:01 a.m.)

25       THE COURT:  Please be seated.  Given my limited

1  time and trial schedule, I may not reduce the reasoning

2  regarding my ruling on venue to writing.

3        Now, I want to make clear that it's based on the

4  fact that the allegations of extortion were designed to

5  disrupt a legal proceeding here in the Middle District of

6  Florida and involved -- and that involved threatening

7  people who were located in the Middle District of Florida.

8  And those threats were included in the messages that

9  originated with the defendant.

10        As soon as the jury lets me know they're ready, I

11  will instruct them and then send them back to deliberate.

12        Thank you.

13        (Recess at 11:02 a.m. to 11:17 a.m.)

14        THE COURT:  Please return the jury.

15        (Jury entered the courtroom at 11:18 a.m.)

16                    **JURY CHARGE**

17        THE COURT:  Members of the jury, it is my duty to

18  instruct you on the rules of law you must use in deciding

19  this case.  After I complete the instructions, you will go

20  to the jury room to begin your discussions, what we call

21  your deliberations.

22        You must decide whether the Government has proved

23  the specific facts necessary to find the defendant guilty

24  beyond a reasonable doubt.

25        Your decision must be based only on the evidence

1    presented during the trial.  You must not be influenced in

2    any way by sympathy for or prejudice against the defendant

3    or the Government.

4         You must follow the law as I explain it, even if

5    you do not agree with the law, and you must follow all of

6    my instructions as a whole.  You must not single out or

7    disregard any of the Court's instructions on the law.

8         The indictment, or formal charge, against a

9    defendant is not evidence of guilt.  The law presumes that

10   every defendant is innocent.  The defendant does not have

11   to prove his innocence or produce any evidence at all.

12        A defendant does not have to testify, and if the

13   defendant chose not to testify, you cannot consider that in

14   any way while making your decision.

15        The Government must prove guilt beyond a

16   reasonable doubt.  If it fails to do so, you must find the

17   defendant not guilty.

18        The Government's burden is heavy, but the

19   Government does not have to prove a defendant's guilt

20   beyond all possible doubt.  The Government's proof only has

21   to exclude any reasonable doubt concerning a defendant's

22   guilt.

23        A reasonable doubt is a real doubt based on your

24   reason and common sense after you've carefully and

25   impartially considered all of the evidence in the case.

1          Proof beyond a reasonable doubt is proof so

2     convincing that you would be willing to rely and act on it

3     without hesitation in the most important of your own

4     affairs.

5          If you're convinced that a defendant has been

6     proved guilty beyond a reasonable doubt, say so.  If you

7     are not convinced, say so.

8          As I said before, you must consider only the

9     evidence that I have admitted in the case.  Evidence

10    includes testimony of witnesses and the exhibits admitted.

11    But anything the lawyers say is not evidence and is not

12    binding on you.

13         You should not assume from anything I have said

14    that I have any opinion about any factual issue in this

15    case.  Except for my instructions to you on the law, you

16    should disregard anything I may have said during the trial

17    in arriving at your own decision about the facts.

18         Your own recollection and interpretation of the

19    evidence is what matters.

20         In considering the evidence, you may use reasoning

21    and common sense to make deductions and reach conclusions.

22    You should not be concerned about whether the evidence is

23    direct or circumstantial.

24         Direct evidence is the testimony of a person who

25    asserts that he or she has actual knowledge of a fact, such

1   as an eyewitness.

2          Circumstantial evidence is proof of a chain of

3   facts and circumstances tending to prove or disprove a

4   fact.

5          There is no legal difference in the weight you may

6   give to either direct or circumstantial evidence.

7          When I say you must consider all the evidence, I

8   do not mean that you must accept all the evidence as true

9   and accurate.  You should decide whether you believe what

10  each witness had to say and how important that testimony

11  was.

12         In making that decision, you may believe or

13  disbelieve any witness in whole or in part.  The number of

14  witnesses testifying concerning a particular point does not

15  necessarily matter.

16         To decide whether you believe any witness, I

17  suggest you ask yourself a few questions.

18         Did the witness impress you as one who was telling

19  the truth?

20         Did the witness have any particular reason not to

21  tell the truth?

22         Did the witness have a personal interest in the

23  outcome of the case?

24         Did the witness seem to have a good memory?

25         Did the witness have the opportunity and ability

1    to accurately observe the things he or she testified about?

2         Did the witness appear to understand the questions

3    and answer them directly?

4         Did the witness' testimony differ from other

5    testimony or other evidence?

6         You should also ask yourself whether there was

7    evidence that a witness testified falsely about an

8    important fact and ask whether there was evidence that at

9    some other time a witness said or did something or did not

10   say or do something that was different from the testimony

11   the witness gave during the trial.

12        But keep in mind that a simple mistake does not

13   mean that a witness was not telling the truth as he or she

14   remembers it.  People naturally tend to forget some things

15   or remember them inaccurately.

16        So if a witness misstated something, you must

17   decide whether it was because of an innocent lapse in

18   memory or an intentional deception.  This may depend on

19   whether the misstatement is about an important fact or

20   about an unimportant detail.

21        During the trial, you heard evidence of acts done

22   by the defendant on other occasions that may be similar to

23   the acts the defendant is currently charged with.  You must

24   not consider any of this evidence in deciding whether the

25   defendant committed the acts charged now.  But you may

1    consider this evidence for other limited purposes.

2         If other evidence leads you to decide beyond a

3    reasonable doubt that the defendant committed the charged

4    acts, you may consider evidence of similar acts done on

5    other occasions in deciding whether the defendant had the

6    state of mind or intent necessary for the crime charged,

7    acted according to a plan or to prepare to commit a crime,

8    or committed the charged acts by accident or mistake.

9         You have been permitted to take notes during the

10   trial.  Most of you, perhaps all of you, have taken

11   advantage of that opportunity.  You must use your notes

12   only as a memory aid during deliberations.  You must not

13   give your notes priority over your independant recollection

14   of the evidence.  And you must not allow yourself to be

15   unduly influenced by the notes of other jurors.

16        I emphasize, notes are not entitled to any greater

17   weight than your memories or impressions about the

18   testimony.

19        During the trial, Exhibit 15-B was identified as a

20   typewritten transcript of the oral conversation heard on

21   the tape recording received in evidence as Exhibit 15-A.

22   The transcript also purports to identify the speakers

23   engaged in the conversation.

24        I admitted the transcript into evidence for the

25   limited and secondary purpose of helping you follow the

1    content of the conversation as you listen to the tape

2    recording.

3         But you are specifically instructed that whether

4    the transcript correctly reflects the content of the

5    conversation or the identity of the speakers is entirely

6    for you to decide based on your own examination of the

7    transcript in relation to hearing the tape recording itself

8    as the primary evidence of its own contents.

9         If you determine the transcript is in any respect

10   incorrect or unreliable, you should disregard it to that

11   extent.

12        The indictment charges six separate crimes, called

13   counts, against the defendant.  Each count has a number.

14   You'll be given a copy of the indictment to refer to during

15   your deliberations.

16        I will now explain the elements of the crimes

17   charged in this case.

18        In counts one through five of the indictment, the

19   defendant is charged with violating Section 875(b) of Title

20   18 of the United States Code, which makes it a federal

21   crime to knowingly transmit an extortion communication in

22   interstate or foreign commerce.

23        The defendant can be found guilty of this crime

24   only if all the following facts are proved beyond a

25   reasonable doubt:

1        One, the defendant knowingly sent a message in

2   interstate or foreign commerce containing a true threat to

3   kidnap any person or injure the person of another;

4        And, two, the defendant did so with intent to

5   extort money or something else of value to the defendant.

6        To transmit something in interstate commerce means

7   to send it from a place in one state to a place in another

8   state.

9        To transmit something in foreign commerce means to

10  transmit it from a place in the United States to anyplace

11  outside the United States, or to transmit it from anyplace

12  outside the United States to a place in the United States.

13       A true threat is a serious threat, not idle talk,

14  a careless remark or something said jokingly, that is, made

15  under circumstances that would lead a reasonable person to

16  believe that the defendant intended to kidnap or injure

17  another person.

18       To act with intent to extort means to act with the

19  purpose of obtaining money or something of value from

20  someone who consents because of fear or because of the

21  wrongful use of actual or threatened force or violence.

22       A thing of value is anything that has value to the

23  defendant, whether it is tangible or not.

24       The heart of the crime is intentionally sending a

25  message in interstate or foreign commerce to extort

1    something of value.  The Government does not have to prove

2    that the defendant intended to carry out the threat or

3    succeeded in obtaining money or any other thing of value.

4           In some cases, a defendant is charged with

5    breaking a law that actually covers two separate crimes.

6           A lesser included offense is a crime that is not

7    as serious as the other crime a defendant is charged with.

8           If you find the defendant not guilty of the crime

9    charged in count one, two, three, four, or five, you must

10   determine whether the defendant is guilty of the lesser

11   included offense.

12           Proof of the lesser included offense in counts

13   one, two, three, four, and five requires proof beyond a

14   reasonable doubt that the defendant knowingly sent a

15   message in interstate or foreign commerce containing a true

16   threat to kidnap any person or to injure the person of

17   another.  It does not require proof beyond a reasonable

18   doubt that the defendant did so with the intent to extort.

19          In count six of the indictment, the defendant is

20   charged with violating Section 1028(a)(7) of Title 18 of

21   the United States Code.  The defendant can be found guilty

22   of this crime only if all the following facts are proved

23   beyond a reasonable doubt:

24          One, the defendant knowingly transferred,

25   possessed, or used without lawful authority a means of

1    identification of another person;

2         Two, the defendant did so with the intent to

3    commit or in connection with any unlawful activity that

4    constitutes a violation of federal or state law;

5         And, three, the transfer, possession, or use of

6    the means of identification was in interstate or foreign

7    commerce.

8         A means of identification includes any name or

9    number that may be used alone or in conjunction with any

10   other information to identify a specific individual.

11        You will see that the indictment charges that the

12   crimes were committed on or about a certain date.  The

13   Government does not have to prove that the crimes occurred

14   on an exact date.  The Government only has to prove beyond

15   a reasonable doubt that the crimes were committed on a date

16   reasonably close to the date alleged.

17        The word knowingly means that an act was done

18   voluntarily and intentionally and not because of a mistake

19   or by accident.

20        Each count of the indictment charges a separate

21   crime.  You must consider each crime and the evidence

22   relating to it separately.  If you find the defendant

23   guilty or not guilty of one crime, that must not affect

24   your verdict for any other crime.

25        I caution you that the defendant is on trial only

1    for the specific crimes charged in the indictment.  You are

2    here to determine from the evidence in this case whether

3    the defendant is guilty or not guilty of those specific

4    crimes.

5         You must never consider punishment any way in

6    deciding whether the defendant is guilty or not guilty.  If

7    you find the defendant guilty, the punishment is for the

8    judge alone to decide later.

9         Your verdict, whether guilty or not guilty, must

10   be unanimous.  In other words you must all agree.  Your

11   deliberations are secret and you will never have to explain

12   your verdict to anyone.

13        Each of you must decide the case for yourself, but

14   only after fully considering the evidence with the other

15   jurors.  So you must discuss the case with one another and

16   try to reach agreement.

17        While you're discussing the case, do not hesitate

18   to reexamine your own opinion and change your mind if you

19   become convinced that you are wrong.  But do not give up

20   your honest beliefs just because others think differently

21   or because you simply want to get the case over with.

22        Remember that in a very real way you are judges,

23   judges of the facts.  Your only interest is to seek the

24   truth to the evidence in the case.

25        When you get to the jury room, choose one of your

```
 1    members to act as foreperson.  The foreperson will direct

 2    your deliberations and will speak for you in court.

 3             A verdict form has been prepared for your

 4    convenience.  It is a two-page document.

 5             It reads, verdict.

 6             Counts one through five of the indictment.

 7             One, as to the offense of communicating an

 8    interstate threat to kidnap or injure with intent to

 9    extort, in violation of Title 18, United States Code,

10    Section 875(b), as charged in counts one through five of

11    the indictment, we, the jury, find the defendant, William

12    A. White:

13             And then the first five counts are listed.  And

14    next to each count are the words guilty and not guilty,

15    with a line after each.

16             Note:  If you answered guilty on all of counts one

17    through five, skip question two and proceed to question

18    three.  If you answer not guilty to any of counts one

19    through five in question one, proceed to question two.

20             Question two is, with regard to any of counts one

21    through five as to which we have indicated not guilty in

22    question one, as to the lesser included offense of

23    communicating an interstate threat to kidnap or injure, in

24    violation of 18, United States Code, Section 875(c), we,

25    the jury, find defendant, William A. White:
```

1          And, again, all five counts are listed, and then

2    the word guilty with a line and the words not guilty with a

3    line for you to indicate your decision as to each.

4          Count six of the indictment.

5          As to the offense of knowingly possessing and

6    using the means of identification of another person in

7    connection with making interstate threats, in violation of

8    18, U.S.C., Section 1028(a)(7), as charged in count six of

9    the indictment, we, the jury, find defendant, William A.

10   White:

11         Again, there's a place to enter a decision, guilty

12   or not guilty.

13         So say we all, this blank day of September, 2014,

14   signed by the foreperson.

15         Take the verdict form with you to the jury room.

16   When you all agree on a verdict, your foreperson must fill

17   in the form, sign it, and date it, and then you will return

18   it to the courtroom.

19         If you wish to communicate with me at any time,

20   please write your message or question and give it to the

21   marshal.  The marshal will bring it to me and I will

22   respond as promptly as possible, either in writing or by

23   talking to you here in the courtroom.  But I caution you

24   that in communicating with me not to tell me how many

25   jurors have voted one way or the other.

```
 1              I'm going to ask Jurors Number 49, 51, and 52 to

 2    take a chair in the front row of the courtroom.

 3              Counsel, come forward, please.

 4              (Discussion at sidebar on the record.)

 5              THE COURT:  Are you satisfied with the reading of

 6    the instructions?

 7              MR. CHIU:  Yes, Your Honor.

 8              THE COURT:  And you?

 9              MR. HENDERSON:  I was, Your Honor.  I renew all of

10    our objections, but I'm satisfied.

11              (End of discussion at sidebar.)

12              THE COURT:  Please take the jury to the jury room.

13              (Jury exited the courtroom at 11:35 a.m. to

14               commence deliberations.)

15              THE COURT:  Would the three of you come forward,

16    please?

17              In virtually every trial that I preside over, I

18    pick an alternate.  Sometimes it's one alternate; sometimes

19    it's been up to six or maybe even more than that in one

20    case that lasted for a long time.

21              But the alternates are very important.  I often

22    rely on them.  And I came very close to relying on one in

23    this case, in which case Juror Number 49 would have been

24    moved to a regular juror's position and out of the

25    alternate position.  It turned out I didn't do that.
```

```
 1              So all three of you were alternates.  And I
 2    apologize for taking your time and then not sending you
 3    back to deliberate.
 4              In civil cases, when I pick alternates, they do
 5    deliberate.  I need a minimum of six.  So I usually pick
 6    eight.  And all eight deliberate in civil cases.
 7              In criminal cases, I'm not allowed to do that.
 8    Only 12 can go back.
 9              So your service is greatly appreciated.  I watched
10    you carefully during the course of the trial and the three
11    of you paid as close as attention as anybody else.  And
12    this was a very attentive jury.  So thank you very much.
13              I'm going to ask that you continue to follow my
14    instructions until a verdict is reached in this case.  I
15    don't know whether that will be today or not, but you can
16    always find out by calling the number downstairs.
17              So please don't watch any news reports.  There's
18    an outside chance that I may be calling you back to work on
19    this case, so it's important that you follow these
20    instructions.
21              Thank you very much.
22              And their notes, too.  Get their notes.
23              Thank you, Mr. Henderson.
24              You may be seated.
25              You're free to wait here in the courthouse.  I
```

```
 1    would prefer it not be in the courtroom because I don't

 2    know what's going to happen here that would happen outside.

 3    You're also free to go home, go back to work, whatever you

 4    want to do.

 5              (Alternate jurors exited courtroom at 11:39 a.m.)

 6              THE COURT:  Okay, gentlemen.  We have a phone

 7    number.  You're free to go back to your offices or

 8    wherever you like.  Make sure you don't go more than about

 9    15 minutes from the courthouse.  There's good chance we'll

10    have questions now.

11              If they're not finished by -- if I don't hear from

12    them by quarter after 4:00, 4:30, my intent is to call them

13    in here and tell them that we cannot stay here beyond 5:00

14    and instruct them accordingly and send them home with

15    instructions to follow the directions I've given them

16    earlier.

17              Okay?  Do you have any problem with that?

18              MR. CHIU:  No, Your Honor.

19              MR. HENDERSON:  No, Your Honor.

20              THE COURT:  We have a forfeiture issue, too.  They

21    won't be happy if they have to go back to do that.

22              Are you going to want an argument on the

23    forfeiture issue?

24              MR. CHIU:  I guess to the extent -- I mean, five,

25    ten minutes at the most.  There's not much to it.
```

```
 1              And, actually, Your Honor, just for the record,

 2   the only items that the Government would be continuing to

 3   seek on forfeiture are the laptop and MP3 player.

 4              THE COURT:  Okay.  Well, we'll have to change our

 5   instructions and verdict form on that then.  The laptop and

 6   the MP --

 7              MR. CHIU:  MP3.

 8              THE COURT:  MP3 player.

 9              MR. CHIU:  I don't believe there's any evidence

10   regarding the other items.

11              THE COURT:  Okay.  Thank you.

12              (Recess at 11:42 a.m.)

13              THE COURT:  I understand the jury has a verdict.

14              Please return the jury.

15                            VERDICT

16              (Jury entered the courtroom at 2:17 p.m.)

17              THE COURT:  Juror Number 21, has the jury reached

18   a verdict?

19              JUROR:  Yes, they have, Your Honor.

20              THE COURT:  Are you the foreperson of the jury?

21              JUROR:  Yes, sir.

22              THE COURT:  Would you deliver the verdict to the

23   marshal, please?

24              Madam Clerk, would you publish the verdict?

25              THE DEPUTY CLERK:  Yes, Judge.
```

1          In the case of United States of America versus

2    William A. White, verdict.

3          Counts one through five of the indictment.

4          One, as to the offense of communicating in

5    interstate threat to kidnap or injure with intent to

6    extort, in violation of 18, United States Code,

7    Section 875(b), as charged in counts one through five of

8    the indictment, we, the jury, find the defendant, William

9    A. White:

10         Count one, guilty.

11         Count two, guilty.

12         Count three, guilty.

13         Count four, guilty.

14         Count five, guilty.

15         Count six of the indictment, as to the offense of

16   knowingly possessing and using the means of identification

17   of another person in connection with making interstate

18   threats, in violation of 18, United States Code,

19   Section 1028(a)(7), as charged in count six of the

20   indictment, we, the jury, find the defendant, William A.

21   White, guilty.

22         So say we all, this 12th day of September,

23   2014.

24         THE COURT:  Members of the jury, your verdict in

25   this case does not complete your service as it would in

 1   most cases, because there's another matter that you must

 2   consider.

 3          You must decide whether the defendant, William A.

 4   White, should forfeit certain property to the United States

 5   as a part of the penalty for the crime charged in count six

 6   of the indictment.

 7          In a portion of the indictment, it's alleged that

 8   the defendant used or intended to use certain property to

 9   commit the offenses charged in count six.  In view of your

10   verdict finding the defendant guilty of that offense, you

11   must also decide whether property should be forfeited to

12   the United States.

13          To forfeit a thing is to be divested or deprived

14   in the ownership of it for certain criminal offenses.  To

15   decide whether the property should be forfeited, you should

16   consider all the evidence you have already heard, plus any

17   additional evidence that may be presented to you after

18   these instructions.

19          The forfeiture allegations of the indictment

20   describe in particular the property allegedly subject to

21   forfeiture to the United States:

22          One, black Toshiba laptop computer;

23          And, two, Philips GoGEAR ViBE 4GB.

24          To be entitled to the forfeiture of any of those

25   items, the Government must have proved by a preponderance

1    of the evidence that the electronic equipment was personal

2    property that was used or intended to be used to commit the

3    offenses charged in count six of the indictment.

4           A preponderance of the evidence simply means an

5    amount of evidence that is enough to persuade you that a

6    claim or contention is more likely true than not true.

7           While deliberating concerning the issue of

8    forfeiture, you must not reexamine your previous

9    determination regarding the defendant's guilt, but all the

10   instructions previously given to you concerning your

11   consideration of the evidence, the credibility of

12   witnesses, your duty to deliberate together, and your duty

13   to base your verdict solely on the evidence without

14   prejudice, bias, or sympathy, and the necessity of a

15   unanimous verdict will continue to apply during these

16   supplemental deliberations.

17          A special verdict form has been prepared for your

18   use, which contains certain questions relating to the

19   assets.

20          You may answer simply by putting an X or a check

21   mark on the space provided next to the word yes or no.  The

22   foreperson must then sign and date the verdict form.

23          Do you have the verdict?

24          THE DEPUTY CLERK:  Yes, Judge.

25          THE COURT:  The verdict form reads, special

1    verdict regarding forfeiture.

2            Having found defendant, William A. White, guilty

3    of count six of the indictment, do you find from a

4    preponderance of the evidence:

5            One, that a black Toshiba laptop computer was used

6    or intended to be used to commit the offense charged in

7    count six of the indictment, in violation of 18, U.S.C.,

8    Section 1028(a)(7).  And a place to answer either yes or

9    no.

10           Two, that a Philips GoGEAR ViBE 4GB was used or

11   intended to be used to commit the offense charged in count

12   six of the indictment, in violation of 18, U.S.C., Section

13   1028(a)(7), yes or no.

14           So say we all, this blank day of September, 2014.

15   Signed, foreman.

16           Does the Government have any additional evidence

17   to present?

18           MR. CHIU:  No, Your Honor.

19           THE COURT:  Does the defendant wish to present any

20   evidence?

21           MR. HENDERSON:  No, Your Honor.

22           THE COURT:  Do you have any additional argument to

23   make?

24           MR. CHIU:  Just briefly, Your Honor.

25           It's been a long week, so I'm not going to take

 1    much time for this.  But the defendant used -- or the

 2    defendant sent these threatening Emails to Mexico -- or

 3    from where he was to these victims.  The testimony was that

 4    he took this Toshiba laptop with him to Mexico, and it was

 5    found on him when he was in Mexico.

 6          Of the items that you see, the Toshiba laptop is

 7    the, really the primary most logical tool that he would

 8    have used to send those threats.

 9          The MP3 player had the songs that lyrics -- whose

10    lyrics were in the threats.  So when you put all that

11    together, along with everything else you've heard, there's

12    really no other conclusion other than by a preponderance of

13    the evidence that the computer and the MP3 player were used

14    in the commission of the offense.

15          Thank you.

16          THE COURT:  Mr. Henderson?

17          MR. HENDERSON:  Yes, sir.

18          Members of the jury, a preponderance of the

19    evidence means it's more likely than not that those items

20    were used in the commission of the crime.

21          I'd suggest that there's really no evidence that

22    those items were used in the commission of the crime.  The

23    fact that they were in the possession of Mr. White does not

24    preclude the fact that anything else could have been used.

25          You've found that it's Mr. White that did this.

```
 1    There's been no tie to the actual computer itself.  There's

 2    been no tie to the MP3 player which really contains songs,

 3    toddler tunes, Johnny Cash, and various other songs.

 4    Lyrics are available online.  Anybody can go online and get

 5    lyrics to any song.

 6            As far as communications, any device that has

 7    Internet hookup can be used to create those threats, those

 8    communications.

 9            There's an absence of evidence tying the crimes to

10    those specific items.  So we ask you to find by a

11    preponderance of the evidence that it is not more likely

12    than not that the computer and MP3 player were used in the

13    furtherance of what you have found Mr. White guilty of and

14    as to count six.

15            THE COURT:  Ladies and gentlemen, when I read you

16    the instruction, in the last paragraph, I referred to

17    assets.  That means property.

18            Please remove the jury.

19            (Jury exited the courtroom at 2:26 p.m. to

20             commence deliberations.)

21            (Discussion off the record.)

22            THE COURT:  We'll be in recess until we hear from

23    the jury.

24            (Recess at 2:32 p.m.)

25            THE COURT:  Please return the jury.
```

```
 1                (Jury entered the courtroom at 2:38 p.m.)

 2           THE COURT:  Ladies and gentlemen, have you reached

 3  a verdict regarding forfeiture?

 4           JUROR:  We have, Your Honor.

 5           THE COURT:  Would you give the verdict to the

 6  marshal, please?

 7           Madam Clerk, would you publish the verdict?

 8           THE DEPUTY CLERK:  Yes, Judge.

 9           In the case of the United States of America versus

10  William A. White, special verdict regarding forfeiture.

11           Having found the defendant, William A. White,

12  guilty of count six of the indictment, do you find from a

13  preponderance of the evidence:

14           One, that a black Toshiba laptop computer was used

15  or intended to be used to commit the offense charged in

16  count six of the indictment, in violation of 18, United

17  States Code, Section 1028(a)(7).

18           Yes.

19           Two, that a Philips GoGEAR ViBE 4GB was used or

20  intended to be used to commit the offense charged in count

21  six of the indictment, in violation of 18, United States

22  Code, Section 1028(a)(7).

23           No.

24           THE COURT:  Mr. Foreperson, would you please date

25  the verdict form?
```

1          MR. HENDERSON:  I would ask the jury be polled as

2     to both verdicts.

3          THE COURT:  Would you poll the jury, Madam Clerk,

4     as to both verdicts?

5          THE DEPUTY CLERK:  Yes, Judge.

6          Juror Number 1, are these your verdicts?

7          JUROR:  Yes.

8          THE DEPUTY CLERK:  Juror Number 2, are these your

9     verdicts?

10         JUROR:  Yes.

11         THE DEPUTY CLERK:  Juror Number 5, are these your

12    verdicts?

13         JUROR:  Yes.

14         THE DEPUTY CLERK:  Juror Number 9, are these your

15    verdicts?

16         JUROR:  Yes.

17         THE DEPUTY CLERK:  Juror Number 21, are these your

18    verdicts?

19         JUROR:  Yes.

20         THE DEPUTY CLERK:  Juror Number 23, are these your

21    verdicts?

22         JUROR:  Yes.

23         THE DEPUTY CLERK:  Juror Number 26, are these your

24    verdicts?

25         JUROR:  Yes.

```
 1              THE DEPUTY CLERK:  Juror Number 32, are these your
 2     verdicts?
 3              JUROR:  Yes.
 4              THE DEPUTY CLERK:  Juror Number 42, are these your
 5     verdicts?
 6              JUROR:  Yes.
 7              THE DEPUTY CLERK:  Juror Number 43, are these your
 8     verdicts?
 9              JUROR:  Yes.
10              THE DEPUTY CLERK:  Juror Number 44, are these your
11     verdicts?
12              JUROR:  Yes.
13              THE DEPUTY CLERK:  Juror Number 46, are these your
14     verdicts?
15              JUROR:  Yes.
16              THE COURT:  Mr. Henderson, would you accompany
17     your client to the lectern, please?
18              Mr. William A. White, do you or does anyone on
19     your behalf have any cause to show why you should not be
20     adjudged guilty of counts one through five?
21              MR. HENDERSON:  Your Honor, we raise all prior
22     objections and motions.  Other than those, no.
23              THE COURT:  There being no cause shown to preclude
24     entry of judgment, the Court does hereby adjudge you guilty
25     of count one, count two, count three, and count four of the
```

1    indictment, charging violations of Title 18, United States

2    Code, Sections 875(b) and (2).

3              The Court reserves ruling with regard to the

4    defendant-- on the defendant's earlier motion with regard

5    to count six.

6              You are hereby remanded to the custody of the

7    United States Marshal to await sentencing.  Sentencing is

8    scheduled for Friday, November 21, 2014, at 10:00 a.m.

9              I will order the probation office to prepare a

10   presentence report and provide copies to counsel and the

11   Court.

12             Thank you.

13             Ladies and gentlemen, I need to, first of all,

14   thank you for your time and consideration of this case, but

15   also to advise you of a privilege that you have as jurors.

16             No juror can ever be required to talk about the

17   discussions that occurred in the jury room except by court

18   order.

19             For centuries, our society has relied upon juries

20   for consideration of difficult cases, and we've come to

21   recognize that a juror's deliberations, discussions, and

22   votes should remain their private affair as long as they

23   wish.  Therefore, the law gives you a unique privilege not

24   to speak to anyone about your work.

25             Although you are at liberty to speak with anyone

```
 1    about your deliberations, you're also at liberty to refuse
 2    to speak to anyone.  A request may come from those who seek
 3    to find fault with your work, or those who may simply be
 4    curious.  It will be up to you to decide whether to
 5    preserve your right to not discuss your work.
 6             I would like you to go with the marshal back to
 7    the jury room, accompanied by Jurors Number 49 and 52,
 8    please.
 9             (Jury exited the courtroom at 2:44 p.m.)
10             THE COURT:  Apparently I neglected to cover count
11    five.  You're also adjudicated guilty of count five,
12    involving charging the same violation.
13             Do you have any further business for the Court?
14             MR. CHIU:  Not from the United States, Your Honor.
15             MR. HENDERSON:  No, Your Honor.
16             THE COURT:  Mr. Henderson, I would like you within
17    ten days to file a more complete motion with regard to
18    count six, and I would require the Government within five
19    days of receipt of that motion to file a response.
20             MR. CHIU:  Yes, Your Honor.
21             MR. HENDERSON:  Yes, sir.
22             (Proceedings adjourned at 2:46 p.m.)
23
24
25
```

1          C E R T I F I C A T E

2

3          I certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7   s\Amie R. First, RMR, CRR

8

9                        **INDEX**

10

11  Closing Argument Government ............ ......   18
    Closing Argument Defense .....................   44
12  Closing Argument Government ..................   68
    Jury Charge ..................................   76
13

14

15

16

17

18

19

20

21

22

23

24

25