UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

VS.                                    CASE NO. 6:13-cr-304-JA-GJK

WILLIAM A WHITE

---

## ORDER

Defendant William A. White filed a motion to reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1). (Doc. 208).   To prevail on his motion, Defendant must show three elements: (1) he exhausted his administrative remedies; (2) extraordinary and compelling reasons exist to warrant a reduction; and (3) he is not a danger to the public. Defendant shows that he exhausted his administrative remedies, but he fails to provide any evidence of extraordinary and compelling reasons to reduce his sentence.  He also fails to show that he is not a danger to the public. Because he cannot satisfy two of the three elements, his motion must be denied.

On September 12, 2014, a jury found Defendant guilty of five counts of communicating an interstate threat to kidnap or injure with intent to extort in violation of 18 U.S.C. § 875(b) (Counts I-V) and one count of knowingly possessing and using the means of identification of another person in connection with making interstate threats, in violation of 18 U.S.C. §

1028(a)(7)(Count VI).[1]   (Doc. 69).  On November 21, 2014, this Court sentenced Defendant to 210 months' imprisonment to be served consecutively to a 92-month term of imprisonment imposed by the district court in the Western District of Virginia (case no. 7:13-cr-00013-GEC-1).  (Docs. 87, 90). At the time this Court sentenced him, Defendant was 37 years old.

Defendant's criminal history includes convictions for the following: at age 19, in the Montgomery County Circuit Court in Rockville, Maryland, possession of a concealed deadly weapon, assault and battery, and resisting arrest; at age 21, in the Superior Court in the District of Columbia, Washington, D.C., assault; at age 31, in the United States District Court of the Northern District of Illinois, solicitation to commit a crime of violence/influencing a juror; also at age 31, in the United States District Court of the Western Division of Virginia, interstate communication of a threat to injure, and tampering with a witness; and at age 35, in the United States District Court of the Western Division of Virginia, extortion by interstate commerce and threat by interstate commerce. (Doc. 81). He is now 43 years old and incarcerated at USP Marion, with a projected release date of March 6, 2037.  (Doc. 214 at 4).

## I.   LEGAL  FRAMEWORK  FOR  REDUCTION  IN SENTENCE

---

[1] A judgment of acquittal was subsequently granted as to Count VI. (Doc. 92).

"The authority of a district court to modify an imprisonment sentence is narrowly limited by statute." *United States v. Phillips*, 597 F.3d 1190, 1194-95 (11th Cir. 2020). Congress granted the courts limited authority to modify a sentence in 18 U.S.C. § 3582(c):

> **(c) Modification of an imposed term of imprisonment.**--The court may not modify a term of imprisonment once it has been imposed except that--
> **(1)** in any case--
> **(A)** the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
> **(i)** extraordinary and compelling reasons warrant such a reduction; or
> **(ii)** the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person

or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Because Defendant is under 70 years of age, he must show extraordinary and compelling reasons to qualify for modification of his sentence under § 3582(c). Factors constituting extraordinary and compelling reasons are outlined in U.S.S.G. 1B1.13, the policy statement underlying 18 U.S.C. §3582. They include (A) medical conditions, (B) a defendant that is at least 65 years of age, and (C) family circumstances.[2] Neither (B) or (C) apply as Defendant is not over 65 and he has no applicable family circumstance.

---

[2] Section (D) of U.S.S.G. 1B1.13 allows a "catch-all" provision for other extraordinary and compelling circumstances as determined by the Director of the Bureau of Prisons. Defendant alternatively seeks relief under this section but this Court cannot grant him relief under this section. The policy statement specifically limits this determination to the Director. And, while the First Step Act amended § 3582(c) to allow a prisoner to bring a motion directly to the court under certain circumstances, it did not amend the underlying policy. The Court is required to follow policy statements of the Sentencing Commission. *See Dillon v. United States*, 560 U.S. 817, 821 (2010)(a "reduction must be consistent with applicable policy statements issued by the Sentencing Commission"); *United States v. Colon*, 707 F.3d 1255, 1259-60 (11th Cir. 2013) (3582(c)(2) requires courts to follow policy statements of the Sentencing Commission); *United States v. Nasirun*, No. 8:99-CR-367-T-27TBM, 2020 WL 686030, at *2 (M.D. Fla. Feb. 11, 2020)("any reduction must be consistent with the policy statements of the Sentencing Commission").

Extraordinary medical conditions include (i) any terminal illness, and (ii) any "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. §1B1.13, cmt. n.1(A).  Even when an extraordinary and compelling reason exists,  a district court should only reduce a term of imprisonment if it determines that the defendant is not a danger to the public. U.S.S.G. §1B1.13(2). And a district  court must consider whether the 18 U.S.C. § 3553(a) factors weigh in favor of release. *See* 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. §1B1.13.

## II.   DISCUSSION

### A. DEFENDANT EXHAUSTED HIS ADMINSTRATIVE REMEDIES

The first question is whether Defendant exhausted his administrative remedies because the failure to do so is fatal to his request. *United States v. Raia*, 954 F. 3d 594, 597 (3d Cir. 2020). ("Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."). Defendant submitted a written request for compassionate release to the warden on  August 23, 2019. (Doc. 214-1).  The warden responded via "Inmate Request to Staff Member Response" denying

Defendant's request. (Doc. 215).   The warden's denial, dated October 28, 2019, was 66 days after receipt of the request.   Accordingly, Defendant exhausted his administrative remedies.

### B. DEFENDANT HAS NOT IDENTIFIED ANY EXTRAORDINARY AND COMPELLING REASONS FOR A REDUCTION IN HIS SENTENCE

Defendant bears the burden of establishing that a reduction in sentence is warranted. *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013). In attempt to meet than burden, Defendant asserts that he suffers from "serious physical and medical conditions and serious functional and cognitive impairments" that have diminished his ability to provide self-care. (Doc. 208 at ¶ 51(a)). Yet he provides no evidence to support this claim.

Defendant specifically claims he suffers from "serious physical and medical conditions causing functional or cognitive impairment" as a result of being "tortured" while in federal custody.  (Doc. 208 at 1). He alleges that these conditions diminish his "ability to provide self-care" in prison. (*Id.*). In support of this claim, Defendant cites the report of clinical psychologist Richard M. Samuels (Ph.D). But, the report of Dr. Samuels says nothing of the sort.

In 2019, Dr. Samuels conducted a psychological evaluation of Defendant. (Doc. 208-2 at 161-205). At the request of Defendant's attorney, Dr. Samuels assessed Defendant's "mental condition." (*Id.* at 162). In

preparing his report, Dr. Samuels interviewed Defendant and his mother. He also reviewed numerous documents including earlier psychological evaluations of Defendant. (Doc. 208-2 at 163). The earlier evaluations were done by Eric Ostrov, J.D., Ph.D. in 2016, Conrad Daum, M.D. in 2009, and James Corcoran, M.D. in 2008. (*Id.*).

Defendant told Dr. Samuels that he had been incarcerated in squalid conditions in 2008 at the Metropolitan Correctional Facility in Chicago, Illinois where he was subjected to "enhanced interrogation conditions." (Doc. 208-2 at 162, 171, 172).[3] Defendant also reported that he suffered from sleep deprivation due to a bright light in his cell in the John E. Polk Correctional Facility in Sanford, Florida in 2014. (*Id.*). Dr. Samuels included Defendant's description of these events in his report.

But Dr. Samuels' report does not conclude that Defendant was tortured. The report states "[w]hether or not what Mr. White experienced was considered torture, what he did go through nonetheless, was a stressful condition that meets the criteria for exposure to traumatic events." (*Id.* at

---

[3] Interestingly, Defendant reported the 2008 incident to Dr. Samuels in 2019, some 11 years after the fact, and to Dr. Ostrov in 2016, 8 years after the fact. (Doc. 208-2 at 206-230). He did not report the incident to either Dr. Corcoran in the very month the incident occurred (Doc. 208-2 at 194-199), or to Dr. Daum, the year after it happened. Doc. 208-2 at 200-205).

7

175). Regardless of Defendant's experience, Dr. Samuels reported that Defendant's "attention, and concentration appeared to be normal" and that "[s]leep was reported to be normal." (*Id.* at 164).

Dr. Samuels concluded that Defendant suffered from "Posttraumatic Stress Disorder, chronic" and a "Narcissistic Personality Disorder, with histrionic, antisocial and obsessive-compulsive traits." (*Id.* at 170). But despite this diagnosis, Dr. Samuels did not find that Defendant was unable to provide self-care.

In reaching his conclusions, Dr. Samuels considered reports prepared by Drs. Corcoran, Daum and Ostrov. These specialists also did not report that Defendant was unable to care for himself. Dr. Ostrov diagnosed Defendant with "Posttraumatic Stress Disorder" and a "Personality Disorder with Borderline and Narcissistic Traits" but noted Defendant denied any physical problems. (Doc. 208-2 at 210, 228). Dr. Corcoran diagnosed Defendant as having a "Personality Disorder with Histrionic, Narcissistic Features," but having no medical problems. (Doc. 208-2 at 198). Dr. Daum diagnosed "Personality Traits not otherwise specified," and found that Defendant was "alert, cooperative and verbal with appropriate speech and thought processes," with no medical problem other than being overweight. (Doc. 208-2 at 201-203, 205).

Countering Defendant's claims, the Government introduced a report from Leslee Brooks, a Certified Physician's Assistant who worked with USP Marion Health Services.  Ms. Brooks prepared a "Reduction in Sentence Medical Review" in response to Defendant's request for compassionate release. She performed an assessment of Defendant's functional ability and completed a medical report.  (Doc. 215 at 9-12).  Ms. Brooks' report was then signed by Dr. Randall Pass, M.D., Clinical Director at USP/SCP Marion. On that part of the assessment labeled "Instrumental Activities of Daily Living" and "Physical Self-Maintenance Scale," Defendant scored the highest number of points possible. (*Id.* at 9-10).  Defendant's medical records from Marion show he sought medical attention three times while detained at that facility: (1) on August 11, 2016 for a skin infection; (2) on July 14, 2017 for a superficial injury from a racquetball game; and (3) in September 2018 for an eye exam (Doc. 215 at 12), all inconsequential. And, on January 23, 2020, Defendant made a preventative health visit to the Marion clinic.  He reported no complaints and no significant findings were noted.  (Doc. 215-1).

None of the medical records produced by Defendant or the Government establish that Defendant suffers from a serious medical condition.  This conclusion is consistent with the Presentence Report ("PSR") prepared by the Probation Office on October 17, 2014.  That PSR states that Defendant had reported no serious physical or medical conditions or history of mental or

9

emotional problems.   His only complaint was of occasional allergies and periodic respiratory infections.  (Doc. 81 at 16).

Defendant fails to identify a medical condition falling within one of the categories specified in the Sentencing Commission's policy statement's application note. He does not assert a terminal condition. He asserts no condition other than posttraumatic stress disorder ("PTSD"). The record includes Defendant's own reports that he is active and physically able to participate in yoga (practicing and teaching yoga) (Doc. 208 at ¶ 41; Doc. 208-1 at ¶ 344), and is sufficiently cognitive to "run[] a small law practice" in the prison.  (Doc. 208 at ¶ 41).  The record establishes that Defendant's PTSD does not prevent him from providing self-care.

## C. THE 18 U.S.C. § 3553(a) FACTORS WEIGH AGAINST GRANTING DEFENDANT RELIEF

If Defendant had presented extraordinary and compelling reasons—which he did not—the Court would be required to consider the 3553(a) factors.  In an abundance of caution, the Court has considered the 3553(a) factors and finds that they also weigh against Defendant's request for relief. The sentence imposed is necessary to protect the public, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to deter Defendant from future crimes.

Defendant was convicted of having threatened to kidnap, rape, and murder Florida state officials—and those officials' spouses, children, and grandchildren—with the intent to extort the officials to dismiss state charges against members of the American Front, a white supremacist organization.

On May 19, 2012, at approximately 2:03 p.m., Defendant posted a request for the names of the judges, federal prosecutors, and FBI agents involved in the American Front case. (Doc. 72-66). At 2:17 p.m. that same day, Defendant wrote on Facebook that "the state people are [FBI Agent] and [State Attorney]" and the "[State Judge]." (*Id.*). At approximately 3:16 p.m., Defendant posted a photo of the State Attorney's family and listed the names of his wife, adult children, and grandchildren. (*Id.*). Then, approximately thirty minutes later, the State Attorney received an email from nslf_helterskelter@hotmail.com, which was the subject of Count 1. The email stated in relevant part:

> Okay PIGS. DIG THIS and DIG IT WELL:
>
> This is JOE TOMASSI, CHARLES MANSON
> AND SON OF SAM talking to YOU all at
> once and telling what is gong [sic] to go down.
>
> We are at your houses, we are at your kids
> houses we are at your grandkids houses and we
> are sitting outside their schools. Don't believe
> me? Here you are pigs, here you are:
>
> [FBI Agent]
> [redacted address]

11

[State Attorney]
[redacted address]

[State Judge]
[redacted address]

Now listen up close and DIG what is
being said or we will be sending you a
message written in blood.

You have arrested FOURTEEN RIGHTEOUS
BROTHERS AND SISTERS with the
AMERICAN FRONT organization. Monday
morning, you are going to go to work and you
are going to drop all state charges against them
and LET THEM GO. AND BY THEM, WE
MEAN:

. . .

IF YOU DO NOT COMPLY WITH THIS
ORDER, we are going to grab your
grandchildren [State Attorney]—[names
redacted]—from school and we are going to
FUCK THEM WITH KNIVES. Then, we are
going to CUT THEIR FUCKING HEADS OFF
and leave them in a COOLER OUTSIDE
YOUR OFFICE, and with the BUCKET OF
BLOOD WE WILL PAINT PIG ON YOUR
WALLS.

Don't believe us? We just CREEPY CRAWLED
the home of [Federal District Judge of the
Western District of Virginia] for the righteous
brother WILLIAM A WHITE and we will CREEPY
CRAWL ALL OVER YOUR ASS LIKE POISON
SPIDERS.

YOU MADE A DEAL WITH THE DEVIL TO BE
WHO ARE AND THE DEVIL HAS COME TO
COLLECT.

> YOURE A KILLER [FBI Agent]—AND YOU ARE NEXT.
> [State Judge] AND [State Attorney]—THE PACT YOU ALL MADE, THE PRICE THAT YOU ALL PAID, THE CHANCE YOU CHOSE TO TAKE, THE CHOICE YOU CHOSE TO MAKE.
>
> THE DEVIL is coming FOR HIS DUE. And when he comes, there WILL BE BLOOD.
>
> /s/
> NATIONAL SOCIALIST LIBERATION FRONT— HELTER SKELTER BRIGADE

(Doc. 72-1). The following day, May 20, 2012 at 2:35 p.m., the same threatening email directed at the State Judge, the State Attorney, and the FBI Agent was sent by the nslf_helterskelter@hotmail.com email address to three different media outlets and to Defendant's personal email address, "dhyphen@yahoo.com." (Doc. 72-19). This email was the subject of Count 2.

Within minutes of that email being sent, Defendant posted on Facebook a virtually identical copy of the email. (Doc. 72-66). At 3:55 p.m., Defendant posted information about the architecture business of the State Attorney's adult son. (Doc. 72-50 at 2). At 4:24 p.m., the State Attorney's son received an email from nslf_helterskelter@hotmail.com at his work address. This email was the subject of Count 3 and stated in relevant part:

> All right pigs, DIG IT:

> We tried to speak to speak [sic] to Grand Pa-pa
> but we don't know that he got it, so we're
> speaking to you.
> You might know me. I was the guy sitting
> outside your house at [redacted address] this
> morning in the Blue Ford. You can call me
> MOTHAFUCKIN CHARLIE MANSON
> MOTHERFUCKER.
>
> Now PAY ATTENTION:
>
> Grand Pa-pa has kidnapped fourteen
> RIGHTEOUS BROTHERS AND SISTERS and
> taken them from their homes and their
> families.
>
> Their names are:
> . . .
>
> He is going to release ALL OF OUR
> BROTHERS AND SISTERS on MONDAY
> MORNING or we are going to grab [name
> redacted] and [name redacted] from school and
> FUCK THEM WITH KNIVES, put THEIR
> HEADS IN A COOLER and drop it off at Grand
> Pa-pas office.

(Doc. 72-2). Later that day, at 7:22 P.M., an individual identified as "Charlie

Fucking Manson" at nslf_helterskelter@hotmail.com attempted to post a copy

of the first threat directed at the State Judge, the State Attorney and the FBI

Agent to a blog managed by the Southern Poverty Law Center (Count 4)(Doc.

72-7). Minutes later, an individual who was once again identified as "Charlie

Fucking Manson" posted the threat on the website for the Anti-Defamation

League (Count 5) (Doc. 72-3).

On May 28, 2012, Defendant wrote on Facebook that Florida officials had not yet complied with the demand to release the American Front prisoners. (Doc. 72-56). The next day, the Defendant posted that the federal government was "exhausting their limited bodyguard budget protecting the homes of the three Florida officials involved and their children/grandchildren. So, as noted, political terror is working pretty well to resolve a situation that could not have been resolved peacefully or legally." (Docs. 72-58; 72-71 at 10).

On June 2, 2012, a link on Defendant's Facebook included a caption containing the addresses of the FBI Agent, the State Attorney, and the State Judge as well as the names of the State Attorney's adult children and grandchildren. (Doc. 72-60). The caption also stated, "Are we going to let them have a monopoly on violence or are we going to stop this injustice?" (*Id.*). (Count 6).

Other posts made by Defendant on Facebook include "You just skip town to a country where they can't reach you and leave some folk behind to creepy crawl into their homes and write the word 'pig' in blood on their walls." (Doc. 72-45). And, "[h]aven't even had to kill anyone yet. LOL" (*Id.*). "Possible tropical storm here in Florida this weekend. Guess we'll have to get the killing in before it starts to rain." (Doc. 72-53). Only when Defendant was arrested in Mexico, did these threatening communications cease.

In determining a reasonable sentence in this case, the court took account of all the § 3553(a) factors including the nature of his multiple threats of violence on public officials and their families, including innocent children. The Court also took account of Defendant's record which included convictions for 2 counts of Interstate Communication of a Threat to Injure (18 U.S.C. § 875(c)), three counts of Extortion by Interstate Communication (18 U.S.C. § 875(b)), one count of Tampering with a Witness (18 U.S.C. § 1512(b)(1)), one count of Threat by Interstate Communication (18 U.S.C. § 875(c)) (Case Nos. 7:08-cr-54-EKD-1 and 7:13-cr-13-GEC-1, W.D. Va.) and one count of Solicitation to Commit Crime of Violence/Influencing Juror (18 U.S.C. §§ 373, 1503) (Case No. 1:08-cr-851-1, N.D. Ill.).

Despite the jury's guilty verdicts on all counts in this case, Defendant continues to claim his innocence. (Doc. 208-1 at ¶ 354). He continues to engage in hate speech, (Doc. 208-1 at ¶ 198) and, he has had disciplinary problems in prison. (Doc. 214-2). Defendant's danger to the public is clear.

## III.   CONCLUSION

For the reasons stated above, Defendant's Motion for Reduction in the

Term of Imprisonment Pursuant to 18 U.S.C. § 3582(c)(1) (Doc. 208) is

**DENIED**.

    **DONE** and **ORDERED** in Orlando, Florida on April 13, 2021.

                              JOHN ANTOON II
                              United States District Judge

Copies furnished to:
United States Attorney
United States Probation Office
William A White